[920 NE2d 359, 892 NYS2d 303]

RIVERSIDE SOUTH PLANNING CORPORATION, Appellant, v CRP/
EXTELL RIVERSIDE, L.P., et al., Respondents.

Argued October 22, 2009; decided November 24, 2009

**POINTS OF COUNSEL**

*Cravath, Swaine & Moore LLP,* New York City (*Max R. Shulman* of counsel), for appellant. I. Riverside South Planning Corporation's interpretation of the sunset provision is reasonable. (*Vermont Teddy Bear Co. v 538 Madison Realty Co.,* 1 NY3d 470; *Williams Press v State of New York,* 37 NY2d 434; *Atwater & Co. v Panama R.R. Co.,* 246 NY 519; *Wirth & Hamid Fair Booking Inc. v Wirth,* 265 NY 214; *Leon v Martinez,* 84 NY2d 83; *Zurakov v Register.Com, Inc.,* 304 AD2d 176; *Blandford Land Clearing Corp. v National Union Fire Ins. Co. of Pittsburgh, Pa.,* 260 AD2d 86; *Kass v Kass,* 91 NY2d 554.) II. The sunset provision does not empower the Extell defendants to undo design decisions already made.

*Schlam Stone & Dolan LLP,* New York City (*Richard H. Dolan* and *Thomas A. Kissane* of counsel), for respondents. I. Plaintiff's appeal should be dismissed because it is from a nonfinal order. (*Burke v Crosson,* 85 NY2d 10; *City of Buffalo v Clement Co.,* 27 NY2d 794, 28 NY2d 241, 29 NY2d 640; *Matter of City of Utica v Weaver Sons Co.,* 259 NY 584.) II. Plaintiff's argument on appeal relies in substantial part on factual matters beyond this Court's powers of review. (*Kass v Kass,* 91 NY2d 554; *W.W.W. Assoc. v Giancontieri,* 77 NY2d 157; *Sterling Fifth Assoc. v Carpentille Corp., Inc.,* 9 AD3d 261; *Van Wagner Adv. Corp. v S & M Enters.,* 67 NY2d 186; *Mitchell, Inc. v Dannemann Hosiery Mills,* 258 NY 22; *Williams Press v State of New York,* 37 NY2d 434.) III. The Extell defendants only assumed the substantive

obligations owed by Donald Trump's entities, all of which had concededly expired two years before Extell acquired their interest in the project. (*Sillman v Twentieth Century-Fox Film Corp.*, 3 NY2d 395, 941; *Ayanru v General Motors Acceptance Corp.*, 130 Misc 2d 440; *Matter of Bradford Cent. School Dist. v Ambach*, 56 NY2d 158.) IV. The obligations created by the 1993 Letter Agreement expired by their terms no later than 10 years from its making. (*Kass v Kass*, 91 NY2d 554; *Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470; *Slamow v Del Col*, 79 NY2d 1016; *Matter of Anonymous*, 189 Misc 375; *Williams Press v State of New York*, 37 NY2d 434; *Evans v Famous Music Corp.*, 1 NY3d 452; *Graev v Graev*, 11 NY3d 262; *Korff v Corbett*, 18 AD3d 248; *Atwater & Co. v Panama R.R. Co.*, 246 NY 519; *People v Brooks*, 34 NY2d 475.)

## OPINION OF THE COURT

GRAFFEO, J.

In this breach of contract case, we are asked to determine the scope of a sunset clause that appears in a 1993 Letter Agreement relating to the development of a parcel of real property. Because we agree with the Appellate Division that, under the provision in question, the obligations in the agreement ceased in 2003—two years before defendant purchased the property—we affirm the judgment dismissing plaintiff's claim.

In 1984, Penn Yards Associates, a partnership controlled by Donald Trump, purchased the Penn Central Railroad Yards—a 76-acre parcel located on the West Side of Manhattan known as Riverside South. Trump floated two proposed development plans in the late 1980s that were opposed by civic groups. Eventually forging an alliance with six of the organizations that had opposed those plans, in 1991 Trump entered into a Memorandum of Understanding with these groups regarding a new Development Plan. The new plan focused on environmental sustainability and design criteria, specified the number, size and permissible uses of the buildings to be erected and reserved space for art studios, parks and other open spaces. With Trump's assistance, plaintiff Riverside South Planning Corporation (RSPC) was formed, an entity comprised of representatives of each of the six groups, along with Trump and a named president.

Thereafter, Trump and RSPC worked together to obtain support from government officials for the Development Plan and, in 1992, formal approval was obtained from the City of New York. Penn Yards recorded a 284-page Restrictive Declaration

with the New York City Register memorializing that approval. Having been recorded in the chain of title, the declaration imposed numerous restrictions on the owner that would run with the land and bind any developer as well as any successors or assignees.[1]

On March 31, 1993, Donald Trump entered into a four-page Letter Agreement with RSPC to "confirm our arrangement to continue working together." After identifying some issues that remained outstanding, Trump agreed that, if he used "Special Permits," he would develop the property in substantial conformity to "design guidelines"[2] and would not apply for any major modifications or rezonings (with specified exceptions) without the approval of a majority of the members of RSPC. Trump further agreed to work with RSPC to oversee the design and construction of the parks and open space in conformity with approved park drawings and park specifications and to delegate his future park maintenance obligations to an independent park maintenance entity (subject to certain conditions). In exchange, RSPC consented to continue its support of the project and to take whatever actions necessary to secure government permits and facilitate development. The contract also contained additional provisions addressing funding for RSPC and the potential for future dissolution of the planning corporation.

Most relevant to this case, a sunset provision was included on the third page of the four-page Letter Agreement stating that "[t]he agreements contained herein" would continue for 10 years, unless either of two conditions were no longer fulfilled, in which case they would cease earlier. In a subsequent paragraph, the developer agreed that if he sold "any Parcel of the Subject Property," he would assign to the purchaser the obligations in the contract. Appended to the agreement and incorporated by

---

**1.** Under the Restrictive Declaration, the developer's compliance with the plan is monitored by the Riverside South Implementation Task Force, which consists of a representative of the Mayor's Office of Construction, the Director of the Department of City Planning, another mayoral appointee (a commissioner of an agency, at the election of the Mayor) and two appointees of the Speaker of the State Assembly.

**2.** The Riverside South Design Guidelines were apparently finalized on May 21, 1993—about two months after the Letter Agreement was executed. Although the Design Guidelines mirror, in some respects, provisions in the Development Plan, they also contain additional details and specifications relating to the design and construction of buildings, such as the dimensions of windows and the percentage of glass making up the exterior facade. The guidelines themselves are unsigned and are not in the form of a contract or restrictive declaration.

reference was a two-page document entitled "LEGAL RE-QUIREMENTS." This addendum clarified that "[n]othing contained in the Letter Agreement is intended to, nor shall be interpreted to, create an interest in real property, a constructive trust, easement, lien or other encumbrance upon the Subject Property," which was consistent with a provision in the Letter Agreement itself stating that the contract would not be recorded in the chain of title.

In 1994, Penn Yards sold the Riverside South property to Hudson Waterfront Associates, L.P., an entity in which Trump had a noncontrolling interest. After the transfer, in his capacity as a partner in Hudson Waterfront, Trump entered into another contract with RSPC noting that he would continue to be a partner in the project and accepting, on behalf of Hudson Waterfront, the obligations imposed in the 1993 Letter Agreement, with certain caveats. It is undisputed that Hudson Waterfront fully complied with the 1993 Letter Agreement while it owned the property.

According to the allegations in RSPC's complaint, in 2005 Hudson Waterfront sold the Riverside South property (or a portion of it) to defendant CRP/Extell Riverside, L.P. (Extell), a company unrelated to Donald Trump. Upon purchase of the property, Extell signed a document in which it agreed to assume any duties and obligations that continued to exist under the 1993 Letter Agreement but stated that it was not admitting that there were any continuing obligations or that the contract remained in effect.

RSPC alleges that, for several months, Extell acted consistently with the Letter Agreement by funding and consulting with RSPC. However, toward the end of 2005, Extell announced that it planned to construct a building that contained more glass on the exterior facade than would be consistent with the Design Guidelines and it failed either to seek approval from RSPC or to conduct an energy efficiency analysis required by the guidelines. Extell then rebuffed RSPC's attempts to participate in the planning process and ultimately declared that it was not bound by the Letter Agreement because, by virtue of the sunset clause, that contract had expired in March 2003, 10 years after it was signed.

In November 2007, RSPC commenced this breach of contract action seeking enforcement of the 1993 Letter Agreement, arguing that the contract remained in effect. Extell answered and

moved to dismiss the claim on the basis of documentary evidence, relying on the plain language of the sunset clause and contending that, since Extell did not purchase the property until two years after the agreement expired, it had no obligations under that contract and therefore could not be sued for its breach.

Supreme Court denied the motion to dismiss, reasoning that the sunset clause was ambiguous because it did not appear at the end of the agreement and, as a result, could be interpreted as applying only to the obligations that preceded it in the document (2008 NY Slip Op 30836[U]). Since the clause relating to assignment to successors—the provision under which obligations might have been passed on to Extell—appeared after the sunset clause, the court concluded that the assignment clause might still have been in effect when the property was purchased by Extell.

In a divided decision, the Appellate Division reversed and granted Extell's motion to dismiss (60 AD3d 61 [2008]). The majority held that the sunset clause plainly established that the Letter Agreement had expired, at the latest, 10 years after it was executed, meaning that it was of no force or effect when Extell acquired the property in 2005. The court was unpersuaded that the placement of the provision on the third page of the contract—as opposed to at the end—permitted the conclusion that the sunset clause applied only to obligations that appeared in the text before it rather than the entire agreement. The two-justice dissent would have upheld the order denying the motion to dismiss as it agreed with Supreme Court that the sunset clause was ambiguous. The dissent surmised that the parties might have intended to limit Trump's obligations to 10 years but to bind successors for a longer period of time if they thought it likely that Trump would sell the property soon after the Letter Agreement was signed. Plaintiff appeals to this Court as of right on the two-justice dissent and we now affirm.

Our rules of contract interpretation are well-established. "[W]hen parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms," and this rule is applied with special force "in the context of real property transactions, where commercial certainty is a paramount concern, and where the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length" (*Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004] [internal quotation marks, ellipses

and citations omitted]). Courts may not "by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing" (*Reiss v Financial Performance Corp.*, 97 NY2d 195, 199 [2001] [internal quotation marks and citation omitted]).

In this dispute, the primary issue is whether there is ambiguity in the language of the sunset clause. "Whether an agreement is ambiguous is a question of law for the courts . . . Ambiguity is determined by looking within the four corners of the document, not to outside sources" (*Kass v Kass*, 91 NY2d 554, 566 [1998] [citations omitted]). The entire contract must be reviewed and "[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought" (*Atwater & Co. v Panama R.R. Co.*, 246 NY 519, 524 [1927]). Where the language chosen by the parties has "a definite and precise meaning," there is no ambiguity (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002] [citation omitted]).

■ The sunset clause in the Letter Agreement provides:

> "*The agreements contained herein* shall continue for ten (10) years, or such lesser period as either of the following conditions shall no longer remain satisfied: (1) the Special Permits shall remain in effect; and (2) I shall own, directly or indirectly, all or any portion of the Subject Property" (emphasis added).

We concur with the Appellate Division majority's view that the phrase "[t]he agreements contained herein" unambiguously encompasses all of the obligations in the contract as it is accompanied by no limiting language suggesting that it refers to only some of the obligations, such as those in the preceding paragraphs as RSPC suggests. The clause indicates that the contract will remain in effect for 10 years and contemplates that it might expire sooner if either of the two listed conditions was not satisfied, e.g., if the developer no longer owned, directly or indirectly, any part of the Riverside South property.

■ Nor is the clause rendered ambiguous by other language in the contract, such as the assignment clause. In that provision, the developer agreed to "require any person who purchases any Parcel of the Subject Property from me so long as the

Special Permits remain in effect, to agree to abide by the agreements in this letter." Although RSPC acknowledges that Trump could not have been bound by the obligations in the letter for longer than 10 years, it asserts that the assignment clause requires that any successor purchaser of the property comply with the agreements as long as the Special Permits remain in effect, even if this extended beyond the decade specified in the sunset provision. It therefore interprets the assignment clause as imposing a broader obligation on a successor than Trump had himself and, based on this interpretation, contends that an ambiguity is created as to the applicability of the sunset clause to an assignee such as Extell.

We are unpersuaded by this analysis. Under the clear wording of the sunset provision, the obligations in the Letter Agreement immediately ceased if Trump no longer owned, directly or indirectly, any portion of Riverside South—if he and his companies sold the entire property—and this would be true even if such a sale occurred within 10 years. In that circumstance, there would be no obligations to pass on to a successor because the contract immediately expired upon Trump's divestiture of ownership. Viewed in this light, there is only one reasonable interpretation of the assignment clause; that provision would have been triggered only if a Trump company retained an interest in Riverside South while selling a portion of the property to an unrelated entity.

In fact, this is precisely what the assignment clause says. If Trump sells *"any Parcel* of the Subject Property" (emphasis added) while retaining an interest in other parcels, he must require the purchaser to abide by the obligations in the Letter Agreement for so long as they remain in effect (which, under the sunset clause, would be no more than 10 years). The sentence that follows the assignment clause further demonstrates that Trump is addressing the sale of a parcel and not the entire "Subject Property" (as Riverside South is referenced elsewhere in the document) as the developer agrees to "contractually require the purchaser(s) to agree to develop *such parcel"* (emphasis added) in accordance with the guidelines. As long as he remained a part of the project and until the Letter Agreement expired, Trump was required to extend to any entity that purchased a portion of the property the same obligations he carried—to work with RSPC until the contract terminated in 2003 (if not sooner). It made sense to include such a provision since, if Trump (through one of his companies) was simultaneously

developing one part of Riverside South while a different organization developed another, such coordination would have been desirable. But the assignment clause does not negate the 10-year limitation on the duration of the contract.

Of course, the parties could have drafted an agreement that restricted the scope of the sunset clause in the manner asserted by RSPC. For example, the assignment clause would have had the meaning RSPC ascribes to it if it read "notwithstanding the language limiting the duration of this agreement," the developer will require any subsequent purchaser to abide by the obligations in this letter for so long as the Special Permits remain in effect. But the contract contains no language indicating a mutual agreement to limit the applicability of the sunset clause with respect to successors.

Thus, like the other obligations in the Letter Agreement, the assignment obligation was restricted by the sunset provision and ended, at the latest, 10 years after the agreement was signed. As the developer, Trump did not agree to assign to someone else obligations he never had and the presence of the assignment clause therefore does not create an ambiguity in the sunset clause. To the extent that Supreme Court and the Appellate Division dissent relied on the inference that the parties must have intended to bind successors for a period greater than 10 years because development of Riverside South could not have been finished within a decade, not only does this rationale consider matters outside the four corners of the agreement but it assumes that the developer agreed to work with RSPC until the project was completed—an obligation that is not stated in the agreement, although it could easily have been included if that had been the parties' intent.

■ Since the Letter Agreement was executed in March 1993, it expired no later than March 2003, two years before Extell purchased the property from Hudson Waterfront. Thus, Extell had no contractual obligation to RSPC that could give rise to this breach of contract claim. RSPC asserts that, even if this is the case, its lawsuit should nonetheless proceed because any other result would allow Extell to "undo" decisions made while the Letter Agreement was in effect. Assuming such a theory could afford a basis for relief against Extell, the complaint does not identify any binding decision made before the Letter Agreement expired that has been disturbed by Extell; for example, RSPC does not allege that, before March 2003, any previous owner had adopted plans and obtained permits for the building

that were different from Extell's proposal and that Extell has modified those plans or sought to amend those permits. We further note that RSPC succeeded in negotiating a Development Plan that incorporated environmental sustainability and design criteria and, unlike the Letter Agreement, such plan is part of the Restrictive Declaration that is recorded in the chain of title and runs with the land, binding all successors for all time—including Extell. Nothing we decide today allows Extell to unravel that significant accomplishment of RSPC.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

Chief Judge LIPPMAN and Judges CIPARICK, READ, SMITH, PIGOTT and JONES concur.

Order affirmed, with costs.