# United States Court of Appeals
### For the Eighth Circuit

_____

No. 12-3982

_____

George K. Baum & Company, a Missouri corporation

*Plaintiff - Appellee*

v.

Twin City Fire Insurance Company, an Indiana insurance company

*Defendant - Appellant*

_____

No. 12-3983

_____

George K. Baum & Company, a Missouri corporation

*Plaintiff - Appellant*

v.

Twin City Fire Insurance Company, an Indiana insurance company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: February 12, 2014
Filed: July 16, 2014

_____

Before RILEY, Chief Judge, LOKEN and BYE, Circuit Judges.

_____

RILEY, Chief Judge.

George K. Baum & Company (Baum) sold or underwrote various municipal bonds, representing the interest on the bonds was tax exempt. The IRS later determined the bonds were not tax exempt. Baum timely notified its insurer, Twin City Fire Insurance Company (Twin City), of the potential for related civil liability, and Twin City agreed the IRS investigation was a claim under the policy. Years later, several lawsuits (derivatives litigation) were filed, and Baum waited almost two years to notify Twin City.

Twin City initially disclaimed coverage on the theory that the derivatives litigation was "not a CLAIM made while the Policy was in force." After Baum filed this suit, Twin City reversed its position and conceded the derivatives litigation and IRS investigation were related, but this time disclaimed coverage "because the Derivatives Litigation was not timely reported." Baum responded that untimely notice is no defense under applicable Missouri law unless the insurer suffers prejudice, and Twin City was not prejudiced. Twin City maintained that New York law, requiring no showing of prejudice, controls this dispute.

The district court[1] decided Missouri law applied, and Twin City conceded it suffered no prejudice from Baum's delay. Resolving a secondary dispute, the district

_____

[1]The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

court also found Baum was liable for a $3 million self-insured retention, rather than the lower $1 million retention Baum believed should apply. Twin City appeals, and Baum cross-appeals. Although we conclude New York rather than Missouri law applies, we nonetheless affirm the judgment.

## I.    BACKGROUND

### A.    Facts

The relevant facts are not disputed. Although Baum has offices across the United States, its principal place of business is in Missouri, where it is also incorporated. Twin City is an Indiana corporation wholly owned by a Connecticut corporation, the Hartford Fire Insurance Company, which in turn is wholly owned by a Delaware corporation, The Hartford Financial Services Group, Inc.

Through a Kansas City, Missouri, insurance broker, Baum obtained professional services insurance from Twin City for the period June 30, 2003, to June 30, 2004. To avoid paying Missouri's surplus lines tax, Baum wanted the policy issued to its small New York office. Twin City agreed, listing Baum's address on the policy as "120 Broadway, Suite 3040, New York, NY 10271." While the basic policy contained no choice of law provision, Twin City added a lengthy amendatory endorsement to comply with New York insurance law. The New York amendments (1) reference New York statutory provisions (e.g., "'public entity' shall mean a public entity as defined in section 107(a)(51) of the New York Insurance Law"), (2) specify that Baum should provide notice to "Hartford Financial Products" at an address in "New York, NY," and (3) provide that notice given "to any licensed agent of the insurer *in this state* [(i.e., New York)] will be deemed notice to the insurer." (Emphasis added).

On August 28, 2003, Baum informed Twin City of an IRS investigation into Baum's work as an "underwriter, structuring agent and remarking agent for approximately twenty-three municipal or government bond issues." In a letter sent

-3-

to Twin City's New York address, Baum warned that it faced actual claims by the IRS and potential claims by Baum's municipal clients and the bondholders themselves. Twin City agreed to treat the IRS investigation as a claim under the policy. Baum ultimately settled with the IRS, agreeing to pay $7.7 million over four years without admitting misconduct.

Approximately two years after settling with the IRS, Baum faced a flurry of lawsuits related to its municipal derivatives[2] business. Numerous municipalities filed complaints against Baum and other brokers, alleging an anticompetitive overpricing scheme. The cases apparently were consolidated in a multi-district proceeding in the Southern District of New York.

On April 6, 2010, Baum first notified Twin City that lawsuits were being filed, as predicted in Baum's 2003 notice regarding potential liability. Twin City denied coverage on June 24, 2010, on the basis that the first complaint at issue "was filed in 2008 and is not a CLAIM made while the Policy was in force." Although Twin City's denial letter (sent from its New York office) referenced the first complaint's filing date (2008), the denial did not discuss an untimely notice defense. The denial merely asserted, "Since the" fact the complaint was not filed during the policy period "appears to be dispositive, it does not seem necessary to address other provisions in the policy which might otherwise also limit coverage for this matter." The denial also contained language purporting to reserve Twin City's rights and defenses.

## B.    Procedural History

On January 27, 2011, Baum filed a complaint against Twin City in the Western District of Missouri, alleging breach of contract and seeking a declaratory judgment.

---

[2]Municipal derivatives are sophisticated financial instruments typically used by municipalities for hedging purposes. See generally David L. Taub, Understanding Municipal Derivatives, 21 Gov't Fin. Rev. 18 (2005).

On March 11, 2011—three days before filing its answer to Baum's complaint—Twin City admitted that its earlier denial of coverage was erroneous:

> Twin City has reviewed carefully [Baum]'s contentions and determined to withdraw its denial based on whether the Claims are related. Twin City therefore will treat the Derivatives Litigation and the IRS investigation *as a single Claim* first made when [Baum] received the September 10, 2003 letter from the IRS.

(Emphasis added). But, for the first time, Twin City announced "that coverage for the Derivatives Litigation is unavailable under the Policy because the Derivatives Litigation was not timely reported as the Policy requires." On March 14, 2011, Twin City filed its answer and counterclaim in the Western District of Missouri, relying on the three-day-old untimely notice defense and seeking a declaratory judgment that Baum was not entitled to coverage.

On cross motions for summary judgment, the district court decided Missouri law, not New York law, applied to the insurance policy. Applying Missouri law, the district court found Twin City could not rely on its untimely notice defense unless Twin City could "prove that it was prejudiced by the late notice." Because the factual pieces of the prejudice question were insufficiently developed, the district court denied summary judgment to both parties.

Turning to Baum's secondary coverage issue, the district court found the derivatives litigation was subject to a $3 million self-insured retention. Although Baum's retention under the policy ordinarily would be $1 million, a $3 million retention applies

> solely with respect to any CLAIM based upon, arising out of, directly or indirectly, resulting from, in consequence of, or in any manner relating to [Baum's] activities as an underwriter or seller of municipal bonds.

Even viewing the issue most favorably to Baum, the district court found the derivatives litigation arose "indirectly or in consequence of the underwriter or seller activity." Therefore, the $3 million retention applied under the plain language of the policy. After the district court's summary judgment order, the parties jointly stipulated to entry of final judgment "in light of Twin City's decision to not contest and thereby forego a jury trial on the issue of whether it was prejudiced by the timing of [Baum's] notice in order to facilitate the entry of a final . . . judgment." The district court entered final judgment: Twin City was obligated to cover Baum, but a $3 million retention applied. Twin City appeals, and Baum cross-appeals.[3]

## II.   DISCUSSION

The district court's jurisdiction arose out of the parties' complete diversity of citizenship. See 28 U.S.C. § 1332(a). Because this case is based on federal diversity jurisdiction, all substantive questions hinge on state law, and we subject the district court's interpretation of the relevant state laws to de novo scrutiny. See Salve Regina Coll. v. Russell, 499 U.S. 225, 231 (1991); Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).

### A.   Choice of Law

Which state's law applies is a legal question decided by the law of the forum state—here, Missouri. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); W. Am. Ins. Co. v. RLI Ins. Co., 698 F.3d 1069, 1073 (8th Cir. 2012). Reviewing the choice of law question in light of sections 188 and 187 of the Restatement (Second) of Conflict of Laws (Restatement), we predict the Missouri Supreme Court would apply New York law to this dispute.

"Missouri adopted sections 188 and 193 of the [Restatement] for choice-of-law issues in casualty insurance contracts." Viacom, Inc. v. Transit Cas. Co., 138 S.W.3d

---

[3]We are authorized by 28 U.S.C. § 1291 to hear this appeal.

723, 724-25 (Mo. 2004) (en banc) (per curiam). Section 188 of the Restatement lists several relevant factors to consider "[i]n the absence of an effective choice of law by the parties (see § 187)." Both parties overlook this proviso, and the district court did not expressly consider the section defining the phrase "effective choice of law by the parties": § 187 of the Restatement.

"Missouri courts . . . apply section 187 in its entirety."[4]  Baxter Int'l, Inc. v. Morris, 976 F.2d 1189, 1196 (8th Cir. 1992). Section 187 indicates that a contract need not contain an express choice of law provision to demonstrate the parties' intent to subject their agreement to a particular state's law. As the official commentary explains,

> [E]ven when the contract does not refer to any state, the forum may nevertheless be able to conclude from its provisions that the parties did wish to have the law of a particular state applied. So *the fact that the contract contains legal expressions, or makes reference to legal doctrines, that are peculiar to the local law of a particular state may provide persuasive evidence that the parties wished to have this law applied.*

Restatement § 187 cmt. a (emphasis added). The commentary provides the following example:

> A contract, by its terms to be performed in state Y, is entered into in state X between A, a domiciliary of X, and B, a domiciliary of Y. The contract recites that the parties "waive restitution *in integrum* in case of *laesio enormis*." These notions are foreign to X local law. They exist, on the other hand, in Y local law which furthermore empowers the parties

---

[4]See, e.g., Huch v. Charter Commc'ns, Inc., 290 S.W.3d 721, 726 (Mo. 2009) (en banc); Bauer v. Farmers Ins. Co., 270 S.W.3d 491, 497 (Mo. Ct. App. 2008); Armstrong Bus. Servs., Inc. v. H&R Block, 96 S.W.3d 867, 872 (Mo. Ct. App. 2002); In re Estate of Brown, 955 S.W.2d 940, 945 (Mo. Ct. App. 1997); Ernst v. Ford Motor Co., 813 S.W.2d 910, 921 (Mo. Ct. App. 1991).

to waive such right of restitution. A court could properly find on these facts that the parties wished to have Y local law applied.

Id.

Section 187's text and commentary make clear New York law should govern this case. Not only was the contract issued to Baum's New York office, but the contract listed New York addresses for both the insurer and the insured, indicating a meeting of the minds between both parties in New York. Importantly, the insurance contract contains numerous New York-specific provisions. As Twin City's brief explains in comprehensive detail, the entire New York endorsement was included in order to comply with New York law. The endorsement expressly refers to New York statutes and regulatory entities (e.g., "the New York Insurance Law" and "the Superintendent of Insurance of the State of New York") and incorporates certain New York statutory language verbatim. This contract both "contains legal expressions" and "makes reference to legal doctrines[] that are peculiar to the local law of" New York. Restatement § 187 cmt. a.

We also note that Baum asked Twin City to issue the policy in New York for the avowed purpose of *avoiding Missouri law*, namely Missouri's surplus lines tax. Baum purposely listed its New York address and availed itself of New York law, notably the state's so-called "Free Trade Zone" statute, see N.Y. Ins. Law § 6301; 11 N.Y. Comp. Codes R. & Regs. tit. 11, § 16.0, in order to purchase an insurance policy in New York containing New York-specific legal provisions. It would be unfair to an insurer for a court to allow an insured to acquire insurance in state Y, having cloaked itself in state Y's laws and thus led the insurer to include legal provisions applicable to state Y (while leaving out provisions applicable to state X), then have the policy construed under state X's laws, to which the insurer did not tailor the insurance contract. Having so thoroughly rejected Missouri law to avoid the

state's surplus lines tax, Baum cannot receive Missouri law's benefits now. See Baxter, 976 F.2d at 1196; Restatement § 187.

### B. Coverage

Although the district court erred by applying Missouri law to the coverage question, we have discretion to affirm despite this error if the record provides an alternate basis for doing so. See, e.g., W3i Mobile, LLC v. Westchester Fire Ins. Co., 632 F.3d 432, 436 (8th Cir. 2011). Twin City asserts (1) Baum provided untimely notice of the derivatives litigation, and (2) the New York law in effect during the period at issue[5] made untimely notice a complete defense to coverage even if the insurer suffered no prejudice. Baum counters that Twin City waived this untimely notice defense by failing to raise it in its initial disclaimer of coverage. Carefully reading the insurance contract in accordance with first principles of New York contractual interpretation, we think both parties' untimely notice and waiver arguments are irrelevant to the ultimate coverage question in this case. Because Twin City's insurance agreement is ambiguous regarding any timely notice requirement applicable to later liabilities arising from a timely original claim, we conclude the policy provides coverage.

### 1. Policy Notice Requirement

The parties present us with two competing readings of the insurance policy's notice requirement. According to Twin City, the policy requires Baum to provide prompt notice not only of the IRS investigation and the potential for related civil liability, but also of each lawsuit ultimately filed. Twin City relies on this provision in the policy's insuring agreement:

---

[5]The parties agree New York law, beginning with insurance policies issued January 17, 2009, has changed. See N.Y. Ins. Law § 3420(a)(4)-(5), (c)(2); Briggs Ave. LLC v. Ins. Corp. of Hannover, 899 N.E.2d 947, 949 (N.Y. 2008).

The Insurer will pay on behalf of the INSUREDS all LOSS which results from *any CLAIM* first made during the POLICY PERIOD . . . against the INSUREDS for a WRONGFUL ACT in the performance of PROFESSIONAL SERVICES, provided that *such CLAIM* is reported to the Insurer, *as soon as practicable, but in no event later than sixty (60) days after the POLICY EXPIRATION DATE . . . .*

(Emphasis added). Baum provided notice of the first derivatives litigation lawsuit on April 6, 2010—far more than "sixty (60) days after the" policy's expiration on June 30, 2004.

Pointing to two other provisions in the policy, Baum asserts the timely notice provision is simply inapplicable to liabilities, such as the derivatives litigation, arising from the same underlying conduct as an earlier, timely notified claim. First, the policy specifies:

All CLAIMS based upon, or arising out of, the same WRONGFUL ACT or INTERRELATED WRONGFUL ACTS shall be considered a *single CLAIM for all purposes . . . under this Policy*, which shall be deemed first made at the time the *earliest* of all such CLAIMS was first made.

(Emphasis added). Second, the policy explains:

[I]f prior to the POLICY EXPIRATION DATE the INSUREDS shall give written notice ["of any WRONGFUL ACT which is likely to subsequently give rise to a CLAIM"] to the Insurer, *as soon as practicable*, with full particulars as to the nature and date of the WRONGFUL ACT, . . . and the manner in which the INSUREDS first became aware of the WRONGFUL ACT, then *any CLAIM* which may potentially and subsequently be made against the INSUREDS arising out of such WRONGFUL ACT shall, *for the purposes of this Policy*, be treated as a CLAIM made *during the POLICY PERIOD*.

(Emphasis added).

As Baum reads these provisions, Baum only had to provide Twin City notice (1) "as soon as practicable" if Baum acted in a way "likely to subsequently give rise to a CLAIM," and (2) "as soon as practicable, but in no event later than sixty (60) days after [June 30, 2004]" of any claim made *during the policy period* (i.e., June 30, 2003-June 30, 2004). Twin City concedes Baum satisfied these obligations by providing prompt notice of potential liability in August 2003 and prompt notice of the IRS's September 2003 investigation letter (i.e., the first "CLAIM" related to the "WRONGFUL ACT" at issue). As a result, every derivatives litigation lawsuit is part of a single claim "deemed" to have been made on September 10, 2003, (the date of the IRS letter constituting the first "CLAIM" related to the derivatives litigation), and Twin City received timely notice—shortly after the September 10, 2003, letter—of this single claim. In other words, all the later-filed derivatives litigation lawsuits constitute "a single CLAIM for all purposes," *including notice*.

We need not decide whether Baum's interpretation is the *only* reasonable one, because we are persuaded the notice requirement on which Twin City relies is at least ambiguous. As Twin City concedes, "the Policy treats Claims arising out of the same Wrongful Act or Interrelated Wrongful Acts as a single claim for *all purposes*." (Emphasis added). It is not readily apparent how Twin City justifies excluding the notice requirement from "all" these "purposes." Mindful that "[i]nsurance contracts must be interpreted according to common speech and consistent with the reasonable expectation of the average insured," Dean v. Tower Ins. Co. of N.Y., 979 N.E.2d 1143, 1145 (N.Y. 2012) (quotation omitted), we do not find any unambiguous basis in the policy for Twin City's proposed limitation of the phrase "all purposes." See, e.g., New Oxford American Dictionary 41, 1418 (3d ed. 2010) (explaining "all" is "used to refer to the whole quantity or extent of a particular group or thing" and defining "purpose" as "a particular requirement or consideration, typically one that is temporary or restricted in scope").

Twin City's reading of the insuring agreement's notice requirement is also flawed because it either (1) abstracts the phrase "as soon as practicable, but in no event later than sixty (60) days after [June 30, 2004]" from the context of the policy as a whole or (2) renders "but in no event later than sixty (60) days after [June 30, 2004]" mere surplusage. Under the first option, the later-filed derivatives litigation suits are not covered because notice was provided "later than sixty (60) days after" the policy expired. The problem with this reading is its incompatibility with other parts of the policy, particularly the provision extending coverage to liabilities occurring more than sixty days after the policy expires but arising from a wrongful act happening before the policy expires. Under New York law, "[i]t is well established that when reviewing a contract, '[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties . . . manifested thereby.'" Kolbe v. Tibbetts, 3 N.E.3d 1151, 1156 (N.Y. 2013) (omission and second alteration in original) (quoting Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P., 920 N.E.2d 359, 363 (N.Y. 2009)).

Under the second option, favored by Twin City, notice of the derivatives litigation was not required within "sixty (60) days" after the policy expired, but merely "as soon as practicable." The problem is this reading ignores "in no event later than sixty (60) days after [the policy's expiration]," which textually applies to, and limits, the preceding "as soon as practicable." Courts applying New York law "should strive to give meaning to every sentence, clause, and word of a contract of insurance." Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 679 N.E.2d 1044, 1048 (N.Y. 1997) (original omission and internal quotation omitted).

Reading the policy as a whole and presuming no word is nugatory, we cannot say the policy's text clearly favors Twin City's reading or forecloses Baum's alternative interpretation. Under New York law, any "'ambiguities in an insurance policy are to be construed against the insurer.'" Dean, 979 N.E.2d at 1145 (quoting

-12-

<u>Breed v. Ins. Co. of N. Am.</u>, 385 N.E.2d 1280, 1282 (N.Y. 1978)). Because Twin City fails to establish that the policy unambiguously mandates its interpretation of the notice provision, we are bound to accept Baum's reasonable, alternative interpretation.

### 2.    Implied Notice Requirement

As a last resort, Twin City advances what appears to be an argument premised upon public policy considerations:

> The Policy's Interrelated Wrongful Acts provision specifies the Policy Period in which a Claim will be deemed made but does not alter or in any way absolve the insured of the obligation to provide timely notice of each Claim purportedly involving Interrelated Wrongful Acts.  If it did, then Baum would be required to provide notice of the initial Claim as soon as practicable but free to wait weeks, months or even years before providing Twin City with notice of any Claim filed after the Policy Period.  Baum does not even attempt to explain any conceivable rationale behind such a counterintuitive interpretation of the Policy.

These are the complaints of a poor draftsman, and we are as unsympathetic as we expect the New York Court of Appeals would be.  Though we can imagine why Twin City might like to receive prompt notice each time a lawsuit is filed that relates to an initial claim, it is not our role to rescue an insurer from its own drafting decisions.  "While this rule produces harsh results in some cases, it also, by encouraging" insurers to eliminate ambiguities, leads to clear and comprehensible insurance contracts.  <u>Briggs</u>, 899 N.E.2d at 948-49.  Only the insurer, after all, has the power to alter the language in the insurance contracts it sells.

In any event, we are not convinced Baum's reading is as "counterintuitive" as Twin City claims.  The premise of Twin City's argument is that unless insurance policies require timely notice, insureds have no notice obligation.  But New York law imposes an implied duty on insured parties to notify their insurer "within a

-13-

*reasonable* time." Thomson v. Power Auth. of N.Y., 629 N.Y.S.2d 760, 761 (N.Y. App. Div. 1995). Is it "counterintuitive" for an insurer to rely on New York's implied notice requirement rather than including a specific notice provision in its policy? Other insurers have certainly chosen to do so. See, e.g., id. In this case, we need not decide whether Baum breached New York's implied notice requirement because—even if Twin City's disclaimer after Baum had already filed suit was not barred "under common-law waiver and/or estoppel principles," Keyspan Gas E. Corp. v. Munich Reins. Am., Inc., ___ N.E.3d ___, ___, 2014 WL 2573382 (N.Y. 2014)—Twin City failed to raise any implied notice argument in the district court or on appeal. See, e.g., St. Paul Fire & Marine Ins. Co. v. Compaq Computer Corp., 539 F.3d 809, 824 (8th Cir. 2008) (explaining an "argument not raised in the district court is waived"); Dill v. Gen. Am. Life Ins. Co., 525 F.3d 612, 621 (8th Cir. 2008) (noting an argument not addressed on appeal is waived).

Even setting aside Twin City's waiver of New York's implied notice requirement, we would be reluctant to predict a breach by Baum of this implied requirement would foreclose coverage under New York law in the absence of prejudice to Twin City. Baum's delay, Twin City concedes, was not prejudicial. The New York Court of Appeals has been reticent to apply its "no-prejudice rule" to cases such as this, where the insurer "received timely notice of [a] *claim* but [arguably] late notice of a *lawsuit*." Argo Corp. v. Greater N.Y. Mut. Ins. Co., 827 N.E.2d 762, 764-65 (N.Y. 2005) (emphasis added).

New York's "rationales for [its no-prejudice rule] include the insurer's need to protect itself from fraud by investigating claims soon after the underlying events; to set reserves; and to take an active, early role in settlement discussions." In re Brandon (Nationwide Mut. Ins. Co.), 769 N.E.2d 810, 813 (N.Y. 2002). "[T]he notice of claim requirement serves this purpose" in cases where some liabilities from the wrongful act may be investigated and settled years before a lawsuit is filed (as happened here with the IRS investigation). Id. Twin City received prompt notice of

-14-

Baum's alleged wrongful act and the probability of future lawsuits, giving Twin City ample opportunity to prepare. It is hard to believe the New York Court of Appeals would think "prejudice is so inevitable" in this case "as to justify further extending the no-prejudice [rule]" when the court did not think so in <u>Brandon</u>. <u>Id.</u> at 814; <u>see also</u> <u>Rekemeyer v. State Farm Mut. Auto. Ins. Co.</u>, 828 N.E.2d 970, 974-75 (N.Y. 2005).

Matters would be different if Twin City had not received initial notice—allowing it to investigate, set reserves, and develop a defense and settlement strategy—or had not learned of the lawsuits until after settlement or (worse) default judgment. <u>See</u> <u>Argo</u>, 827 N.E.2d at 765. But in the present circumstances, it would be illogical for the New York Court of Appeals to expand its "limited exception to th[e] general rule" that "one seeking to escape the obligation to perform under a contract must demonstrate material breach or prejudice." <u>Brandon</u>, 769 N.E.2d at 813 (internal quotation omitted). We do not go so far as to issue a definitive prediction, however, because (1) Twin City's waiver means we need not do so to resolve this case, and (2) our distance from the Empire State gives us every reason to believe this nuance of New York's anomalous no-prejudice rule is unlikely to arise in our circuit again. <u>See</u>, <u>e.g.</u>, <u>id.</u> at 813 n.3 (recognizing New York stands almost, if not completely, alone in adhering to its strict no-prejudice rule).

For these reasons, we conclude the district court ultimately was correct in resolving the primary coverage question in Baum's favor.

### C.    Self-Insured Retention

We also affirm the district court's declaration that a $3 million self-insured retention applies to the derivatives litigation because the litigation is sufficiently related to Baum's business underwriting and selling municipal bonds.

-15-

Baum's opening brief fails to cite a single authority supporting the idea that a $1 million retention applies to the derivatives litigation. The district court's rejection of Baum's argument was entirely correct:

> The best I can say for [Baum] is that, viewing this case independently from the IRS investigation, it would appear to essentially involve brokerage activity. The case does not directly result from activities as an underwriter or seller. However, the parties do not dispute that indirectly or in consequence of the underwriter or seller activity this controversy arose.

The language of the policy plainly applies the $3 million retention to any claim which "*in any manner relat[es]* to [Baum's] activities as an underwriter or seller of municipal bonds." (Emphasis added); see, e.g., New Oxford American Dictionary, supra, at 1473 (defining "relate to" as "have reference to; concern").

As we explained in our coverage analysis, the only reason Twin City must cover the derivatives litigation at all is that the litigation arose out of the same underlying wrongful acts giving rise to IRS liability. The policy makes it clear that "all purposes" under the policy "includ[e], but [are] not limited to, the applicability of a single Aggregate Limit of Liability *and Retention*." (Emphasis added). "If the plain language of the policy is determinative, [courts applying New York law] cannot rewrite the agreement by disregarding that language." Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co., 945 N.E.2d 1013, 1017 (N.Y. 2011). The same $3 million retention which applied to the IRS liability must also apply to the related derivatives litigation.

## III.   CONCLUSION

Applying New York law to the substance of this insurance dispute, we affirm the district court's judgment for the reasons stated in this opinion.

_____