**Affirmed and Opinion filed December 30, 2014.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-13-00530-CV

---

### PHILIPPE RENEE NOTTEBOHM MAGANA AND MERCANTIL MURCIA, S.A. DE C.V., Appellants

### V.

### CITIBANK, N.A., CITIBANK TEXAS, N.A., CITIGROUP, INC., AND ANA MARIA NOTTEBOHM MAGANA, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF PHILIPPE OTTO NOTTEBOHM DEKKERS, DECEASED, Appellees

---

**On Appeal from Probate Court No. 4**
**Harris County, Texas**
**Trial Court Cause No. 405,973-401**

---

**O P I N I O N**

This is a dispute between a brother and sister over ownership of funds in three accounts. Philippe Otto Nottebohm Dekkers (Dekkers) and his wife[1] opened

---

[1] Although Philippe Otto's surname was Nottebohm, that is also the surname of the principal parties to this appeal, so we refer to him as Dekkers to avoid any ambiguity. Dekkers'

two accounts with Citibank, N.A., and Dekkers eventually opened an investment account with Citigroup, Inc. Their children, appellant Philippe Rene Nottebohm Magana (Philippe Rene) and appellee Ana Maria Nottebohm Magana (Ana), were added as signatories on the three accounts, which we refer to collectively as the "Citibank accounts." After Dekkers died, a dispute arose between Philippe Rene and Ana regarding the distribution of the funds held in the Citibank accounts. Philippe Rene filed suit against Ana and Citibank seeking, among other things, a declaration determining the "rightful distribution of the funds" in the accounts. Appellant Mercantil Murcia, S.A., a Mexican corporation, intervened in the litigation claiming it owned the funds in the accounts. Philippe Rene nonsuited Citibank and modified his claims against Ana to assert that the funds in the Citibank accounts belonged to Mercantil Murcia. Following a jury trial, the trial court rendered judgment in favor of Ana and divided the funds in the Citibank accounts.

Philippe Rene and Mercantil Murcia raise five issues on appeal. In their first issue, appellants contend they are entitled to a new trial because the trial court's official court reporter had lost her certification before trial began. In appellants' view, this meant there was no record of the trial. We overrule this issue because appellants have not demonstrated they were harmed as a result of the court reporter's loss of her certification. In their second issue, appellants contend the trial court abused its discretion when it admitted evidence allegedly in violation of the Dead Man's Rule found in Rule 601 of the Texas Rules of Evidence. Because the challenged evidence is cumulative of other evidence admitted without objection, we overrule this issue.

_____

wife, Carolina Magana, died approximately ten years before Dekkers. Carolina played no direct role in the events at issue in this litigation.

2

In their third issue, appellants argue that the submission of three jury questions tainted the jury's perception of the facts to such an extent that it caused the jury to return an incorrect verdict. We conclude appellants waived this issue on appeal because they failed to cite any legal authority in support of their argument. We overrule appellant's fourth issue challenging the sufficiency of the evidence because we conclude that the record contains sufficient evidence to support the trial court's judgment. We also overrule appellants' fifth issue in which they contend the trial court erred when it: (1) ruled that the investment account was not a joint account with right of survivorship, (2) refused to declare that Ana was not an owner of the Citibank accounts as of May 19, 2011, (3) refused to order Citibank to honor a $2.5 million check Philippe Rene wrote on May 20, 2011, and (4) refused to award Philippe Rene his attorneys' fees pursuant to the Uniform Declaratory Judgment Act. We therefore affirm the trial court's judgment.

## BACKGROUND

### A. The Citibank accounts and their disposition

Dekkers operated a successful import/export company in Mexico.[2] Dekkers and his wife opened a checking account at Citibank as early as 1974. They also opened a savings account with Citibank. The Dekkers later added their children, Ana and Philippe Rene, as signatories to both accounts.[3]

---

[2] The evidence indicates that Dekkers operated the import/export brokerage business of his wife's family, which was named either Magana Sirera or Magana Sierra. The evidence also indicates that Dekkers was involved in the operation of another import/export business, appellant Mercantil Murcia. While the corporate records for Mercantil Murcia admitted into evidence establish that Dekkers did not own Mercantil Murcia stock, there was evidence in the record that he worked for (even controlled) the business, and that he ultimately made the decision in 2010 to allow Philippe Rene to acquire his stock in the company.

[3] The evidence is disputed regarding when the children were added to the accounts. According to Ana, they were added as signatories on the accounts sometime in the 1980s, after they had attained adulthood. Philippe Rene testified they were not added to the accounts until

3

Dekkers' wife died in 2001. After her death, Dekkers, Ana, and Philippe Rene signed documentation (1) confirming that the approximately $2.1 million in the two Citibank accounts at that time were personal funds, and (2) designating the three of them as the accountholders. In 2003, Dekkers opened an investment account with Citigroup, Inc. Dekkers, Ana, and Philippe Rene were listed as the accountholders on that account as well.

Dekkers learned he had leukemia in 2009. After he received that diagnosis, Dekkers discussed how he wished to divide his assets upon his death with Ana and her husband, Jorge Halvas. Dekkers explained that he wanted to split the money in the three Citibank accounts equally between his two children. According to Ana, Dekkers told her that the money in the Citibank accounts was his personal money and did not belong to Mercantil Murcia. In addition, Halvas testified that Dekkers never mentioned that the money in the Citibank accounts belonged to a company.

In January 2011, Dekkers travelled to Houston for medical treatment. Dekkers would remain in Houston until his death. Both Ana and Philippe Rene came to Houston and would spend alternating days with him. In March 2011, Dekkers told Ana that Philippe Rene was pressuring him to give Philippe Rene more than half of Dekkers' assets. Dekkers gave Ana his medical power of attorney at that time. Dekkers also drafted a will in April 2011. The 2011 will specifically mentioned the Citibank accounts and directed that they be divided equally between Ana and Philippe Rene. The will also designated Ana as the executor of Dekkers' estate.

In early May 2011, Dekkers decided that he did not wish to receive any further medical treatment. As his condition worsened, Dekkers remained in the hospital and he experienced periods of mental confusion. When it became clear

2003.

4

that the end was near, Dekkers made the decision to move to hospice care. May 18 was chosen as the date for the move. On that morning, Ana came into Dekkers' hospital room after Philippe Rene had stayed overnight. Ana found a wine bottle and two glasses in the room. When Ana arrived, Philippe Rene showed her a handwritten note, dated May 18, 2011, that he said had been written by Dekkers. The note asked Citibank to "[p]lease take note that contrary to my former instructions only my son Philippe Rene Nottebohm is authorized to sign [checks] of my account . . . . 2814."[4] The note also asked for a confirmation from Citibank. According to Ana, Philippe Rene showed her the note and told her "that was what was going to happen."

Dekkers moved to the hospice that same day. When asked about her father's condition when he was transported to the hospice, Ana testified that he was weak, unable to take care of himself, and was confused. Dekkers' hospice records report that he was lethargic, agitated, and minimally responsive the day of the move.

When Philippe Rene transmitted the May 18 note to Citibank, Sandino Gonzalez, the Citibank representative who testified during the trial, informed Philippe Rene in a telephone call that he could not remove any names from the Citibank accounts unless he received a document signed by all persons named on the accounts authorizing the removal. According to Gonzalez, this requirement was found in the Citibank accounts' terms and conditions, was Citibank's standard procedure dealing with the removal of a title holder of an account, and was the procedure Citibank always followed. Gonzalez testified that he had never spoken to Philippe Rene before the May 18 call. Gonzalez sent a form to Philippe Rene that he could use to obtain the necessary signatures.

---

[4] Citibank representative Sandino Gonzalez testified that Dekkers did not have an account at Citibank with an account number that ended 2814.

Philippe Rene presented the form to Ana the next day and demanded that she sign. After asking Dekkers if he wanted her to sign the form and he told her no, Ana refused to sign it. Philippe Rene sent the form dated May 19 to Citibank with his signature and that of Dekkers but without Ana's signature. After receiving the form, Gonzalez told Philippe Rene that Citibank would not remove Ana from the accounts without her signature. Citibank froze the accounts at that point in time. Gonzalez testified that the accounts were frozen because he perceived there was a dispute among the accountholders.

On May 20, Philippe Rene wrote a check for $2,503,258 payable to himself and drawn on the Citibank checking account. He then had his wife take the check to the Houston office of U.B.S., his own financial institution. The record is unclear whether she attempted to deposit the check into Philippe Rene's personal account at that time. Ultimately, the check was never paid. Once Philippe Rene realized the Citibank accounts had been frozen, he entered Dekkers' hospice room and angrily demanded that his father call Citibank about the accounts because he believed Ana had frozen them.

Concerned about Philippe Rene's behavior in her father's last days, Ana had the doctor at the hospice examine Dekkers to determine his mental capacity. Dr. Thuy Hanh Trinh examined Dekkers and determined that he did not have mental capacity as of that date, May 20, 2011. Dr. Trinh directed that a letter to that effect be prepared, which she then signed. Dekkers died two days later. At the time of Dekkers' death, the Citibank accounts had deposits totaling approximately $4 million.

### B.     Philippe Rene's suit to declare ownership of the accounts

Dekkers' April 2011 will was filed for probate in Harris County. The will was admitted to probate without contest and Ana was appointed executor of

Dekkers' estate. Philippe Rene filed a separate suit in Harris County district court against Citibank and Ana, which was transferred to Harris County Probate Court No. 4.

Philippe Rene's original petition alleged that the funds in the Citibank accounts were for the purpose of running an unnamed business operated by Dekkers and himself. Philippe Rene further alleged that Citibank had improperly refused to: recognize Dekkers' May 18 note instructing Citibank to remove Ana as a signatory on the accounts, and cash the $2.5 million check he had written on the Citibank checking account. Philippe Rene sought declarations (1) that Ana was no longer a signatory on the Citibank accounts; (2) ordering Citibank to honor the $2.5 million check; and (3) ordering Citibank to interplead the funds in the three Citibank accounts into the registry of the trial court. Ana filed an answer and a counterclaim seeking a declaratory judgment with respect to the interests of the parties in the three Citibank accounts.

Philippe Rene initially sued in his individual capacity. Only weeks before the trial was scheduled to start, Philippe Rene amended his pleadings to claim that the money in the Citibank accounts belonged to Mercantil Murcia and that Citibank held the money in constructive trust for the benefit of Mercantil Murcia. Philippe Rene also dismissed with prejudice all of his claims against both Citibank and Citigroup. In addition, Mercantil Murcia intervened in the lawsuit.

The probate court held a five-day jury trial. Although Dekkers, Ana, and Philippe Rene resided in Mexico, the three accounts at issue here were deposited with Citibank and Citigroup in New York. Gonzalez testified during the trial that he was the private banker in New York serving as the bank's contact person with Dekkers from 2009 until Dekkers' death. Gonzalez testified that the accounts were held as joint tenants with right of survivorship. Gonzalez further testified,

7

however, that he was not actually familiar with the investment account agreement because it was with Citigroup. Gonzalez further testified that in performing his duties for Citibank he met only with Dekkers. According to Gonzalez, Dekkers never suggested that the funds in the Citibank accounts were anything other than his personal funds. Gonzalez explained that it was his understanding that the Citibank accounts were personal accounts and not business accounts. In addition, Gonzalez testified that he had never heard of Mercantil Murcia. Finally, Gonzalez testified that he had never spoken to Ana or Philippe Rene until just days before Dekkers' death.

Philippe Rene testified at length during the trial regarding appellants' allegation that the funds in the Citibank accounts belonged to Mercantil Murcia. According to Philippe Rene, Mercantil Murcia was formed as a Mexican corporation in 2002. Philippe Rene testified that he and his wife owned Mercantil Murcia and his father never owned an interest in the company. He also testified that he served as the president of the company from its formation.[5]

During the trial, appellants introduced Plaintiff's Exhibit 67 into evidence. Exhibit 67 was a handwritten document taken from a three-ring binder. Philippe Rene testified Exhibit 67 was Mercantil Murcia's business ledger. Appellants argued the ledger established that the funds deposited in the Citibank accounts belonged to Mercantil Murcia. In support of this argument, Philippe Rene testified that the ledger documented all of Mercantil Murcia's transactions and commissions from 2001 until the time of the trial. While Philippe Rene conceded some of the entries in the ledger were in Dekkers' handwriting and predated the formation of Mercantil Murcia, Philippe Rene claimed he kept the ledger as a record of the

---

[5] It is undisputed that Philippe Rene was not an owner of the company until he obtained the shares of Mercantil Murcia stock owned by a cousin in November 2010.

8

commissions he had earned from Mercantil Murcia transactions. Philippe Rene also testified that all of the commissions mentioned in the ledger were deposited into the Citibank accounts and that no other money was deposited into those accounts between 2002 and the time the accounts were frozen. Philippe Rene also testified that Mercantil Murcia regularly advanced money from the Citibank accounts to clients of Mercantil Murcia to finance their purchases of products. According to Philippe Rene, he wrote the $2.5 million check to advance funds to a Mercantil Murcia client.

Ana testified during the trial that she always believed the money in the three Citibank accounts was her father's money. She further explained that she had no reason to believe that the money in those accounts belonged to a company.

Ana called two expert witnesses to testify during the trial. Alex Perez, a tax attorney practicing in Texas, testified concerning United States tax laws and documents produced during the litigation. Perez testified that appellants' contention that Mercantil Murcia owned the funds deposited in the Citibank accounts was inconsistent with the records that he examined. Perez testified that Form W-8BEN, a Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding, is a United States government form that requires foreign depositors to confirm, under penalties of perjury, that the account is owned by the signer individually and not by a company. According to Perez, the Form W-8BENs associated with the Citibank accounts indicate that the funds deposited in the accounts were owned by individuals and not by a corporation. The evidence introduced at trial established that Philippe Rene, Dekkers, and Ana had all signed Form W-8BENs for the Citibank accounts between 2000 and 2011. On each form that he signed, Philippe Rene swore that the Citibank accounts were owned by individuals and not by a company.

9

Manuel Tron, a Mexican attorney whose practice focuses on Mexican corporate taxation and the financial reporting obligations of Mexican corporations, testified regarding Mercantil Murcia's claim to the Citibank account funds. Tron began by testifying regarding Philippe Rene's authority to control Mercantil Murcia. Tron testified that based on his review of Mercantil Murcia's corporate records, Philippe Rene had no authority to act on behalf of Mercantil Murcia prior to November 2010. Tron also testified that he found no documentary evidence that Philippe Rene was the president of Mercantil Murcia. According to Tron, Mexican law requires formal documentation confirming a person's appointment to such a position.

Tron also testified regarding his review of Mercantil Murcia's Mexican tax returns and other financial records. Tron testified that Mercantil Murcia started filing tax returns in 2002 as required by Mexican law.[6] According to Tron, if Mercantil Murcia owned the funds deposited in the Citibank accounts, it was required by Mexican law to report that money as an asset on its tax returns. Tron testified that none of the Mercantil Murcia tax returns he reviewed listed the Citibank accounts as an asset. In addition, Tron testified that Mercantil Murcia's tax returns established that it never had total assets approaching the amount of money deposited in the Citibank accounts. Tron concluded that Mercantil Murcia's tax returns were completely inconsistent with appellants' claim that the Citibank accounts belonged to Mercantil Murcia.

Tron opined that Mercantil Murcia's financial statements were also inconsistent with appellants' claim. According to Tron, Mexican law requires corporations to maintain financial statements. He testified that if the money in the Citibank accounts belonged to Mercantil Murcia, that should have been reported in

---

[6] Tax returns for 2002, 2004, 2006, 2007, 2009, and 2010 were admitted into evidence.

10

Mercantil Murcia's financial statements. Tron testified that after examining all of the financial statements produced by appellants, he determined that the Citibank accounts were not reported. Tron also determined that Mercantil Murcia's financial statements did not report that it had earned net profits or had cash on hand sufficient to support its claim that it owned the funds deposited in the Citibank accounts.

Finally, Tron testified regarding one additional type of financial record he would have expected to find in Mercantil Murcia's records if the money in the Citibank accounts belonged to Mercantil Murcia and if the ledger actually recorded Mercantil Murcia transactions. According to Tron, Mexican law requires a company earning a commission to issue an invoice documenting that income. Tron explained that Mexican tax law requires a company to keep these invoices for five years. Tron testified that he found no invoices reporting the commissions Mercantil Murcia allegedly earned on the transactions reported in the ledger.

Tron concluded his testimony by opining that, after hearing the trial testimony and reviewing the documents produced in the case, there was no evidence that Mercantil Murcia owned any of the funds deposited in the Citibank accounts.

At the conclusion of the evidence, the jury returned a verdict in favor of Ana on the issues relevant to this appeal. Among other things, the jury: did not find that the Citibank accounts operated as a constructive trust for the benefit of Mercantil Murcia; found that Dekkers lacked mental capacity when he signed the May 18 letter and the May 19 form and that he signed them as a result of undue influence; found that Philippe Rene tortiously interfered with Ana's inheritance rights and awarded her $30,000 in damages; and found the amount of reasonable and necessary fees of Ana's and Philippe Rene's attorneys.

11

Based on the jury's verdict, the trial court signed a judgment that Philippe Rene and Mercantil Murcia take nothing. The court awarded Ana $30,000 in damages for tortious interference as well as attorneys' fees of $550,000 for trial and $60,000 for appeal. The court also declared that the Citibank checking and savings accounts were joint accounts with right of survivorship and ordered Citibank to distribute half of the money in those accounts to Ana and half to Philippe Rene, with certain deductions from Philippe Rene's share to cover Ana's damages and most of her attorneys' fees. Finally, the trial court declared that the Citigroup investment account belonged to Dekkers' estate, and it authorized Ana (as executor) to reimburse herself individually from this account for the remainder of her attorneys' fees and for her expert costs. This appeal followed.

## ANALYSIS

Appellants bring five issues on appeal. We address each issue in turn.

I. **Appellants have not established that they are entitled to a new trial as a result of the court reporter losing her certification.**

In their first issue, appellants argue they are entitled to a new trial because the official court reporter of the probate court lost her certification before the trial began. Appellants begin their argument by citing former section 52.021(a) of the Texas Government Code, which provided that "a person may not be appointed an official court reporter . . . unless the person is certified as a shorthand reporter by the supreme court." Act of June 12, 1985, 69th Leg., R.S., ch. 480, § 1, 1985 Tex. Gen. Laws 1988 (amended and re-designated 2013) (current version at Tex. Gov't Code Ann. § 154.101 (West Supp. 2014)). In appellant's view, the undisputed fact that the official court reporter lost her certification prior to trial is equivalent to the reporter's record being lost or destroyed, and as a result there is no reporter's record and a new trial is required. *See* Tex. R. App. P. 34.6(f) (providing that if an

12

appellant can establish that a significant exhibit or portion of a court reporter's notes and records have been lost or destroyed and the parties cannot agree to a replacement, the appellant is entitled to a new trial).

Appellants also argue that even if there were a valid reporter's record, they are still entitled to a new trial because there are numerous inaccuracies in that record. In making this argument, appellants once again rely on Rule 34.6 of the Texas Rules of Appellate Procedure. We disagree that either argument establishes that appellants are entitled to a new trial.

We begin with appellants' argument that they are entitled to a new trial because there is no reporter's record. Appellants focus on the first section of the statute establishing the requirement that an official court reporter of a trial court in Texas must be certified. *See* Act of June 12, 1985, 69th Leg., R.S., ch. 480, § 1, 1985 Tex. Gen. Laws 1988 (amended 2013). But another part of the same statute charges the Court Reporters Certification Board[7] with the responsibility for enforcing the certification requirement. *See* Act of June 19, 1993, 73d Leg., R.S., ch. 1037, § 1, 1993 Tex. Gen. Laws 4451 (amended and re-designated 2013) (current version at Tex. Gov't Code Ann. § 154.101 (West Supp. 2014) ("The board may enforce this section by seeking an injunction or by filing a complaint against a person who is not certified by the supreme court in the district court of the county in which that person resides or Travis County. Said action for an injunction shall be in addition to any other action, proceeding, or remedy authorized by law. The board shall be represented by the attorney general and/or the county or district attorney of this state, or counsel designated and empowered by the board."). Once appellants discovered the court reporter had lost her

---

[7] Effective September 1, 2014, the Judicial Branch Certification Commission assumed all duties previously performed by the Court Reporters Certification Board.

certification, the statute indicates that their recourse was to report that fact to the Court Reporters Certification Board or the local county attorney or district attorney so they could seek an injunction or other authorized remedy,[8] not to raise the issue on appeal as a basis for a new trial. *Id.*

Moreover, we disagree with appellants' premise that there is no reporter's record of the trial proceedings as a result of the official court reporter losing her certification before trial. It is undisputed that a voluminous reporter's record was filed in this appeal. That record was prepared from the previous court reporter's notes and was certified as a true and correct transcription of the trial proceedings by Hipolita Lopez, the current official court reporter for the probate court.[9] Thus, the record as a whole has not been lost or destroyed as required for appellants to obtain a new trial under Rule 34.6(f).

We also conclude that appellants have not established their entitlement to a new trial on the ground that a significant trial exhibit or portion of the reporter's record is missing. Appellants initially point out that two witnesses, Dr. Trinh and Warren Wills (one of appellants' attorneys), are not listed in the Master Chronological Index and Alphabetical Witness Index. Appellants are correct with respect to the Alphabetical Witness Index, but both witnesses are listed in the Master Chronological Index, and—most importantly—their testimony is included in the reporter's record. Appellants do not argue that even a portion of either witness's testimony is missing. Under these circumstances, we conclude the

[8] For present purposes, we need not decide whether the certification requirement could also be enforced through a quo warranto action alleging that the court reporter was unlawfully holding her office. *See* Tex. Civ. Prac. & Rem. Code Ann. § 66.001 (West 2008). Such an action must be filed by the attorney general or the county or district attorney of the county where the court is located. *Id.* § 66.002.

[9] The exact certification provides: "I, Hipolita Lopez, certify that the foregoing is a true and correct transcription, to the best of my ability, of the stenographer's notes and transcription of the proceedings held as provided to me by [the previous reporter] in the above matter."

14

Alphabetical Witness Index is not a significant portion of the record, and thus the omission of these witnesses from that index does not require a new trial. *See* Tex. R. App. P. 34.6(f) (requiring that a significant portion of the reporter's record be lost or destroyed for an appellant to be entitled to a new trial).

Appellants next argue they are entitled to a new trial because the jury sent out a question regarding the absence of the second notebook of appellants' trial exhibits.[10] In response to the jury's question, the court reporter commented that notebook 2 was not sent back because none of its contents were admitted into evidence. Appellants assert this comment shows that three exhibits originally placed in notebook 2 that were admitted into evidence—plaintiffs' exhibits 86, 87, and 88—were not sent back to the jury during deliberations.

The handling of this jury question does not entitle appellants to a new trial for several reasons. First, appellants agreed to—and in fact suggested—the trial court's answer to the jury's question: "[t]here is no Number 2 and only two notebooks. These are the only exhibits admitted into evidence on behalf of plaintiffs." During this discussion between the trial court and the parties' attorneys, appellants did not argue that the jury's question meant that the three admitted exhibits had not been sent back to the jury along with all of the other admitted exhibits. Moreover, one of appellants' attorneys examined the exhibits before they were sent back to the jury and agreed and confirmed on the record that they were the admitted exhibits and should go to the jury for their deliberations. Finally, appellants do not argue that exhibits 86, 87, and 88 are missing from the reporter's record; nor could they, because the exhibits are found in volume 11. Therefore, even if the three exhibits were not sent back to the jury for its

---

[10] Appellants placed their proposed exhibits into three consecutively numbered notebooks. It is undisputed that notebooks 1 and 3 were sent back to the jury during deliberations.

deliberations, Rule 34.6(f) would not provide a basis for a new trial. *See* Tex. R. App. P. 34.6(f) (providing, in part, that an appellant is entitled to a new trial if a significant exhibit is missing from the reporter's record).

Appellants also seek a new trial because the reporter's record does not contain any of the parties' discussions regarding how to respond to two additional questions from the jury. The two questions were included as exhibits in the reporter's record. Both questions addressed what turned out to be typographical mistakes in the jury charge. We conclude appellants have not established that the discussions, if any, regarding how to respond to the two jury questions are necessary to the resolution of this appeal as required by Rule 34.6(f)(3). *See* Tex. R. App. P. 34.6(f)(3). Therefore, this omission, if any, does not entitle them to a new trial. *Town of Flower Mound v. Teague*, 111 S.W.3d 742, 766 (Tex. App.—Fort Worth 2003, pet. denied).

Finally, appellants contend the reporter's record is not clear at times whether Ana was answering questions in English or whether the answer is the result of the translator's interpretation. But appellants have not challenged the questioned portion of Ana's testimony as inaccurate or missing because it has been lost or destroyed. Thus, they have not met their burden under Rule 34.6(f) to establish their entitlement to a new trial. In addition, even if appellants were arguing that the court reporter inaccurately transcribed Ana's testimony, we conclude they would not be entitled to a new trial because they did not take advantage of the remedy provided by the Rules of Appellate Procedure. *See* Tex. R. App. P. 34.6(e) (providing that if there are inaccuracies in the reporter's record, the parties can correct the inaccuracy by agreement, and if the parties cannot agree, the trial court must resolve the disagreement).

16

Having addressed and rejected each argument raised in appellants' first issue, we overrule that issue.

## II. Appellants have not established they were harmed by any admission of evidence in violation of the Dead Man's Rule.

In their second issue, appellants assert the trial court erred when it admitted evidence they contend violates the Dead Man's Rule found in Rule 601(b) of the Texas Rules of Evidence. *See* Tex. R. Evid. 601(b) ("In civil actions by or against executors . . . in which judgment may be rendered for or against [the executor] as such, neither party shall be allowed to testify against the others as to any oral statement by the testator . . . unless that testimony to the oral statement is corroborated . . . ."). Appellants specifically complain about testimony by Jorge Halvas, Ana's husband, regarding a conversation he had alone with Dekkers regarding Dekkers' desire to divide his property evenly upon his death. Appellants argue this evidence was uncorroborated, violated the Dead Man's Rule, and the trial court abused its discretion when it admitted the evidence over their objection.

The admission and exclusion of evidence is committed to the trial court's sound discretion. *Prestige Ford Co. v. Gilmore*, 56 S.W.3d 73, 78 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (citing *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995)). We will reverse only if the trial court abused its discretion by acting without reference to any guiding rules or principals or by acting arbitrarily or unreasonably. *In re R.J.P.*, 179 S.W.3d 181, 184 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (citing *City of San Benito v. Rio Grande Valley Gas Co.*, 109 S.W.3d 750, 757 (Tex. 2003)). A party seeking to reverse a judgment based on evidentiary error must prove that the error probably resulted in an improper judgment, which requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *Tex. Dep't. of*

17

*Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). The exclusion of evidence is likely harmless if the evidence was cumulative. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). We make this determination by reviewing the entire record. *Prestige Ford Co.*, 56 S.W.3d at 78.

Even if we were to assume without deciding that Halvas's challenged testimony violates the Dead Man's Rule, we conclude appellants have not demonstrated that they were harmed by its admission because the testimony was cumulative of other evidence that was admitted without objection. This evidence includes Ana's testimony about Dekkers' statements that he wished to split the accounts between her and Philippe Rene, as well as Dekkers' 2011 will, which had been admitted to probate without contest. The will divided Dekkers' accounts equally between his two children. *See Huffman v. Huffman*, 339 S.W.2d 885, 888 (Tex. 1960) (stating that the intent of the testator must be determined from the words used in the will); *In re Craft Estate*, 358 S.W.2d 732, 733 (Tex. Civ. App.—Amarillo 1962, writ ref'd n.r.e.) ("A written will is generally defined as an instrument by which a person makes a disposition of his property, to take effect after his death, and which by its own nature is ambulatory and revocable during his lifetime."). Because appellants have not shown they were harmed as a result of the admission of the challenged testimony, we overrule their second issue on appeal. *See* Tex. R. App. P. 44.1(a).

## III. Appellants waived their third issue.

In their third issue, appellants contend the trial court committed reversible error when it submitted issues of malice, undue influence, and duress because the submission of these questions "so badly tainted the jury's perception of the facts that it caused the jury to return incorrect answers." The Rules of Appellate Procedure require that a brief contain a clear and concise argument for the

18

contentions made, with appropriate citations to legal authority and the record. Tex. R. App. P. 38.1(i). Appellants failed to cite any legal authority in support of their third issue. Therefore, we conclude they have waived this issue and we overrule it. *Id.*, *see Collins v. Walker*, 341 S.W.3d 570, 575 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (applying Tex. R. App. P. 38.1(i)).

## IV.  The evidence is factually sufficient to support the judgment.

In their fourth issue, appellants challenge the factual sufficiency of the evidence supporting the jury's answers to five questions in the charge.[11]  We address each challenge separately.

### A.  Standard of review

In reviewing the factual sufficiency of the evidence, we must examine the entire record, considering both the evidence in favor of, and contrary to, the challenged findings. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). When a party attacks the factual sufficiency of an adverse finding on which it had the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). When a party challenges the factual sufficiency of the evidence supporting a finding for which it did not have the burden of proof, we may set aside the verdict only if it so contrary to the overwhelming weight of the

---

[11] Appellants do not expressly state that they are challenging the factual sufficiency of the evidence, though they do refer to the weight of the evidence. In this circumstance, we may examine their brief's prayer for relief to determine what standard of review to use to resolve their issue on appeal. *See Benevente v. Granger*, 312 S.W.3d 745, 747 (Tex. App.—Houston [1st Dist.] 2009, no pet.). In their prayer for relief, appellants ask only that we reverse and remand the case for a new trial. Because remand is the normal remedy when the evidence is factually insufficient, we construe appellants' fourth issue as a challenge to the factual sufficiency of the evidence, not to its legal sufficiency. *Id.* In any event, because we determine that the evidence is factually sufficient to support the jury's answers, we conclude it is legally sufficient as well.

evidence as to be clearly wrong and unjust. *See Ellis*, 971 S.W.2d at 407; *Nip v. Checkpoint Systems, Inc.*, 154 S.W.3d 767, 769 (Tex. App.—Houston [14th Dist.] 2004, no pet.). When there is no objection to the charge, we measure the sufficiency of the evidence according to the charge submitted to the jury. *Garza v. Cantu*, 431 S.W.3d 96, 103 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). If we determine the evidence is factually insufficient, we must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict; we need not do so when affirming a jury's verdict. *Gonzalez v. McAllen Med. Ctr., Inc.,* 195 S.W.3d 680, 681 (Tex. 2006) (per curiam).

We are not a finder of fact. *Ellis*, 971 S.W.2d at 407. Accordingly, we may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would support a different result. *Id.* Instead, the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). In addition, the jury is not bound by the testimony of an interested witness merely because it is uncontradicted. *Preston Reserve, L.L.C. v. Compass Bank*, 373 S.W.3d 652, 657 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The testimony of an interested witness may establish a fact as a matter of law only if the testimony could readily be contradicted if untrue, it is clear, direct and positive, and there are no circumstances tending to discredit it. *Id.* at 657–58. When presented with conflicting evidence, a jury may believe one witness and disbelieve others, and it also may resolve inconsistencies in the testimony of any witness. *Id.* at 658 (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986)).

**B.** **Appellants have not established that the evidence supporting the jury's answers to Questions 1(a) and 1(b) is factually insufficient.**

Appellants begin their fourth issue by arguing the evidence supporting the jury's negative answers to Questions 1(a) and 1(b), on which they had the burden of proof, is factually insufficient. Question 1 asked:

> Do you find that the Citibank Accounts operated as a Constructive Trust for the benefit of Mercantil Murcia, S.A. de C.V.?
>
> **Question 1(a):** Based on a confidential and/or a fiduciary relationship and promise between [Dekkers] and Mercantil Murcia, S.A. de C.V.?
>
> Answer "yes" or "no": _No_
>
> **Question 1(b):** Based on a confidential and/or a fiduciary relationship and promise between [Philippe Rene] and Mercantil Murcia, S.A. de C.V.?
>
> Answer "yes" or "no": _No_
>
> **Question 1(c):** Based on a confidential and/or a fiduciary relationship and promise between [Ana] and Mercantil Murcia, S.A. de C.V.?
>
> Answer "yes" or "no": _No_

The question then instructed the jury

> that a constructive trust exists if there (1) was a confidential and/or fiduciary relationship; (2) a promise by that person to hold an amount of funds in the Citibank Accounts for the benefit of Mercantil Murcia, S.A. de C.V.; (3) a transfer and/or deposit of money into the Citibank Accounts in reliance on the promise; and (4) an unjust enrichment to another if Mercantil Murcia, S.A. de C.V. was deprived of its ownership interest in the money in the Citibank Accounts.

Finally, the question defined Citibank Accounts to include the checking, savings, and investment accounts.

According to appellants, the only items of evidence in the record related to Questions 1(a) and 1(b) were (1) Philippe Rene's testimony that the Citibank

accounts were operated as a constructive trust for the benefit of Mercantil Murcia and that all funds in those accounts came exclusively from Mercantil Murcia, (2) the ledger, and (3) the documents Philippe Rene testified backed-up the ledger entries. Appellants then assert that this evidence was uncontradicted and therefore we must reverse the judgment because a jury cannot disregard uncontradicted facts. In making this argument, appellants do not challenge the sufficiency of the evidence supporting the jury's negative answer to Question 1(c).[12] They also do not mention the definition of constructive trust found in the Charge and offer no explanation of how the allegedly uncontradicted evidence establishes each element of a constructive trust.

Ana responds that there was abundant evidence introduced during the trial that contradicted Philippe Rene's testimony as well as the ledger and the supporting documents. We agree with Ana. This evidence includes, but is not limited to, the undisputed fact that the three accounts were not held in Mercantil Murcia's name. This evidence was reinforced by the Form W-8BENs introduced into evidence, which stated that the funds in the Citibank accounts were owned by individuals and not by a corporation.

The evidence also includes expert and fact witness testimony addressing the accounts. Perez, an American tax attorney, testified that the United States government requires foreign depositors to complete Form W-8BENs confirming under penalties of perjury that the account is owned by the signer individually and not by a company. The jury also heard testimony from Tron, a Mexican attorney

---

[12] In her brief, Ana argues that we must affirm the judgment because appellants did not challenge the sufficiency of the evidence supporting all three sub-questions submitted to the jury as part of Question 1. In Ana's view, for appellants to be successful on their constructive trust cause of action, they were required to obtain affirmative answers to all three sub-questions found within Question 1. Because we overrule appellants' argument in the first part of their fourth issue on other grounds, we do not reach this contention. *See* Tex. R. App. P. 47.1.

specializing in Mexican tax law and corporate governance, that Mercantil Murcia's tax returns and mandatory financial statements do not disclose it had Citibank accounts in New York.

The evidence also includes Gonzalez's testimony that he was the Citibank private banker assigned to the accounts, that it was his understanding that the money in the accounts were personal funds, that Dekkers never suggested that the funds in the accounts were anything other than his personal funds, and that he had never heard of Mercantil Murcia until the litigation was underway. The jury heard Ana's testimony that the money in the Citibank accounts belonged to her father and Philippe Rene's admission that he had never personally deposited any money into the Citibank accounts. Philippe Rene also testified that Mercantil Murcia had its own Citibank account in Los Angeles.

There was also extensive documentary evidence contradicting appellants' theory. In addition to the W-8BENs discussed above, this evidence included the ledger itself. It never references Mercantil Murcia and it contains entries predating the formation of Mercantil Murcia by as much as five years. In addition, Philippe Rene's testimony during the trial regarding Mercantil Murcia and the ledger's origins and contents contained many inconsistencies. These included: (1) the name Mercantil Murcia was not found anywhere in the ledger; (2) the ledger contained entries predating the formation of Mercantil Murcia by as much as five years; (3) the ledger did not explain how the Citibank accounts had $2.1 million deposited in them prior to Mercantil Murcia's 2002 formation; (4) Philippe Rene testified that he was not added as a signatory on the Citibank accounts until 2003, a year after he testified all deposits into the account were made with Mercantil Murcia's funds; (5) appellants did not introduce into evidence documents, such as purchase orders, invoices, and deposit slips, connecting each ledger entry to Mercantil Murcia; (6)

the three packages of documents appellants did offer into evidence in support of their claim the ledger documented Mercantil Murcia transactions did not mention Mercantil Murcia; (7) Mercantil Murcia's annual balance sheets and Mexican tax returns that were admitted into evidence during the trial never reported more than $110,000 cash in the bank and did not report any money deposited in foreign bank accounts; (8) Philippe Rene admitted he had not matched any deposits listed in the ledger with deposits reported on Citibank account statements; (9) appellants offered no explanation for the ledger entries ending in October 2010, the month Dekkers left Mexico for surgery in the United States; (10) there is no record in the ledger of the advances Philippe Rene testified Mercantil Murcia would regularly make to clients; and (11) Philippe Rene admitted Mercantil Murcia maintained its own Citibank account in Los Angeles, California that could have been used for deposits of funds generated by its international transactions.

Appellants also offered no explanation for the undisputed fact that the Citibank accounts already had deposits of more than $2 million at the time Mercantil Murcia was formed. Documents were also admitted into evidence demonstrating that Dekkers deposited money into the accounts under his own name and that he had deposited checks into the accounts that had been written by Mercantil Murcia and were payable to him.

Faced with this conflicting evidence, the jury was allowed to believe the testimony of one witness and disbelieve the testimony of others. The jury was also empowered to resolve any inconsistencies in the evidence and witness testimony. *Preston Reserve, L.L.C.*, 373 S.W.3d at 658. Its decision to resolve these questions against appellants does not render the evidence insufficient. Having considered all of the evidence, we conclude the jury's negative answers to Questions 1(a) and 1(b) are not against the great weight and preponderance of the evidence.

24

**C. New York law and the account agreements render Jury Questions 3 and 4 immaterial.**

Appellants next challenge the factual sufficiency of the evidence supporting the jury's answers to Questions 3 and 4 of the charge, on which Ana had the burden of proof. In response to Question 3, the jury found that Dekkers lacked mental capacity when he signed the May 18, 2011 note purporting to give Philippe Rene the sole authority to sign checks and the May 19, 2011 form directing Citibank to remove Ana's name from the accounts. In Question 4, the jury found that Dekkers signed the same documents as a result of undue influence. Ana responds that (1) there is sufficient evidence supporting the jury's answers; and (2) even if the evidence were insufficient, appellants would not be entitled to a new trial because a valid signature by Dekkers could not remove Ana's interest in the accounts under New York law. We agree with Ana's second argument and therefore need not address her first.

A jury finding may be disregarded if it is unsupported by the evidence or if the issue is rendered immaterial. *Nat'l City Bank of Ind. v. Ortiz*, 401 S.W.3d 867, 883 (Tex. App.—Houston [14th Dist.] 2013, pet. denied.). Among other reasons, a jury question is considered immaterial when its answer cannot alter the effect of the verdict. *Id.*

Pursuant to the account agreements, as well as New York law, the Citibank accounts were joint accounts with right of survivorship. *See* N.Y. Banking Law § 675 (McKinney 2011). It is undisputed Ana was one of the joint owners of the accounts. Under New York law, once Ana was added as a joint owner of the accounts, she possessed an immediate interest in a proportionate share of the funds in the accounts. *See In re Covert*, 761 N.E.2d 571, 576 (N.Y. 2001) (citing *Brown v. Bowery Sav. Bank*, 415 N.E.2d 906 (N.Y. 1980)). Therefore, no one, including

25

Dekkers, could divest Ana of her ownership interest by removing her name from the accounts. *See Brown*, 415 N.E.2d at 908; *Lopez v. Fenn*, 937 N.Y.S.2d 1, 3–4 (N.Y. App. Div. 2011). Gonzalez's testimony confirmed that the Citibank account agreements were consistent with these legal principles. According to Gonzalez, Citibank reserved the right to require all account owners to approve the removal of an owner from a joint account. He further testified that Citibank always followed this procedure.

Because neither the May 18 note nor the May 19 form included Ana's signature approving her removal as an owner of the accounts, even if the jury had answered "no" to both questions, the answers would not have altered the effect of the verdict. Therefore, we conclude Questions 3 and 4 are immaterial, and we need not address appellants' challenge to the sufficiency of the evidence supporting the jury's affirmative answers to those questions. *See* Tex. R. App. P. 47.1.

### D. There is factually sufficient evidence supporting the jury's determination that Philippe Rene tortiously interfered with Ana's inheritance rights.

Appellants next challenge the factual sufficiency of the evidence supporting the jury's determination that, in answer to Question 6, Philippe Rene tortiously interfered with Ana's inheritance rights.[13] Appellants begin with the assertion that Ana's tortious interference cause of action was based exclusively on Philippe Rene

---

[13] In Question 6 the jury was instructed that tortious interference with inheritance rights occurs when (1) a party has an expectancy of inheritance or gift; (2) there is a reasonable certainty that the expectancy would have been realized but for the interference; (3) the inference was intentional and done without just cause or excuse; (4) the interference took the form of conduct such as fraud, duress, or undue influence; and (5) damages result from the interference. The jury was also instructed that "fraud, misconduct, an illegal action and intentional invasion of or interference with property or property rights, causing injury without just cause or excuse, constitute tortious or wrongful acts." Appellants did not object to these instructions.

initiating this litigation. They go on to argue that the filing of a lawsuit cannot serve as the basis for a tortious interference claim. Because the record contains evidence supporting Ana's tortious interference claim that predates Philippe Rene's filing of this lawsuit, we disagree.

This pre-litigation conduct includes Philippe Rene (1) orchestrating the preparation and sending of the May 18, 2011 note to Citibank attempting to limit check writing privileges only to himself; (2) sending the May 19, 2011 form to Citibank even after Ana had refused to sign the document authorizing her removal as an owner on the accounts; (3) admitting that he contacted Citibank regarding his desire that the Citibank accounts be divided seventy-five percent to him and twenty-five percent to Ana; (4) asking Citibank to liquidate the entire investment account on May 20, 2011; and (5) writing himself a $2.5 million check[14] on the Citibank checking account the day after he was unsuccessful at obtaining Ana's signature on the May 19 form. In light of this proof of Philippe Rene's efforts to interfere with Ana's inheritance rights, we conclude the evidence supporting the jury's affirmative answer to Question 6 is factually sufficient.

### E. The evidence supporting the award of Ana's attorneys' fees and costs is factually sufficient.

In their final sufficiency challenge, appellants contend the evidence is insufficient to support the full award of attorneys' fees in the judgment. The jury found that Ana's reasonable and necessary attorneys' fees were $550,000, and the trial court determined that an award in this amount was equitable and just. The judgment specifically allocated those fees as follows: (1) it awarded Ana, individually, $363,510 in attorneys' fees to be paid out of Philippe Rene's share of

---

[14] The check was written for an amount equal to the approximate total amount in the account on that day.

the Citibank checking and savings accounts, and (2) it directed Ana, as executor of Dekkers' estate, to pay herself, individually, $186,490 to reimburse her for attorneys' fees and costs incurred as a result of the litigation. In a table at the end of its judgment, the trial court separated this second amount into $86,490 of attorneys' fees and $100,000 of "costs assoc. with Experts."

Appellants argue the attorneys' fee award should be reduced by $100,000 to $450,000 because it includes the improper recovery of expert witness expenses. Appellants only argument on appeal is that the judgment's inclusion of expert witness expenses was improper because they cannot be recovered as court costs.

It is generally true that a party may not recover expert witness fees as court costs. *See May v. Ticor Title Ins.*, 422 S.W.3d 93, 106 (Tex. App.—Houston [14th Dist.] 2014, no pet.) We conclude, however, that the trial court did not award Ana expert witness fees as court costs or pursuant to the Uniform Declaratory Judgment Act. We conclude instead that the trial court had authority under former section 242 of the Texas Probate Code to reimburse Ana for the expert witness fees she incurred as a result of the lawsuit filed by Philippe Rene. *See* Act of April 4, 1955, 54th Leg., R. S., ch. 55, § 242, 1955 Tex. Gen. Laws 88, 161, *repealed by* Act of June 19, 2009, 81st Leg., R. S., ch. 680, § 10, 2009 Tex. Gen. Laws 1512, 1731 (current version at Tex. Estates Code § 352.051 (West 2014)). Former section 242 permits Ana, as the executor of Dekkers' estate, to recover all necessary and reasonable expenses she incurred in connection with the preservation, safekeeping, and management of the estate. *Id.* Ana's attorney testified that Ana had incurred $446,000 in attorneys' fees prior to the trial even being completed and $100,000 in fees owed to the two expert witnesses, both of whom were attorneys, as a direct result of the litigation started by Philippe Rene.

Appellants do not challenge the factual sufficiency of the evidence

supporting the jury's finding that these fees were reasonable and necessary, or the trial court's determination that awarding these fees was equitable and just.[15] Instead, they argue solely that the fees of attorney expert witnesses are not recoverable as costs. Because such fees are recoverable under former section 242 of the Probate Code, however, we conclude that the judgment need not be modified to remove the expert component of the fee award.

Having addressed and rejected each argument raised in appellants' fourth issue, we overrule that issue.

## V.    Appellants' challenges to the trial court's legal rulings fail.

In their fifth issue, appellants raise four separate sub-issues asserting that the trial court erred. We address each sub-issue in turn.

### A.    The trial court did not err when it ruled the investment account was not a joint account with rights of survivorship.

Appellants begin their first sub-issue by asserting that the trial court erred when it concluded that the investment account was not a joint account with right of survivorship and instead was part of Dekkers' estate. Before trial, the court granted a partial summary judgment that there was no presumption of survivorship as to the investment account. At trial, the parties stipulated that whether the accounts were joint accounts with right of survivorship would be determined by the trial court rather than the jury.

---

[15] Appellants also do not raise any complaint on appeal regarding the procedure of submitting a single question to the jury encompassing the fees of the attorneys representing Ana as well as the fees paid to Ana's attorney experts. Accordingly, we express no view on the propriety of this procedure. At the charge conference, the parties stipulated that the jury's finding of fees would be "a cap" and that the further determination of what award would be equitable and just and what amount was incurred for the preservation of the estate would be made by the trial court.

29

On appeal, appellants make a single argument in support of their first sub-issue. They begin by contending that the only evidence in the trial record regarding the character of the investment account was the testimony of Sandino Gonzalez, the Citibank representative. In appellants' view, Gonzalez testified without contradiction that the accounts at issue in this case were joint accounts with right of survivorship. They go on to argue that because Gonzalez's testimony was not contradicted, it must be taken as true.

Appellants do not challenge the trial court's partial summary judgment ruling or address the evidence submitted in connection with that ruling. Regarding the evidence they do address, we conclude Gonzalez never unambiguously testified that the investment account was a joint account with right of survivorship. Gonzalez testified that he was the private banker working at Citibank assigned to Dekkers. Although Gonzalez agreed that the Citigold Private Client terms and conditions—including the right-of-survivorship provision—applied to all of the subject accounts, he later testified that the investment account was with Citigroup, a different institution. He went on to testify that he was not familiar with the terms of that particular account application form. Because Gonzalez's testimony is internally conflicting, the trial court, as the stipulated fact finder, was free to believe that Gonzalez did not know what terms governed the investment account. Therefore, the record does not support appellants' only contention in their first sub-issue, and we overrule that sub-issue.

## B. The trial court committed no error when it refused to declare that Ana was no longer an owner of the Citibank accounts.

In their second sub-issue, appellants assert that the trial court erred when it did not declare that Ana was no longer an owner of the Citibank accounts as of May 19, 2011, the day Philippe Rene sent the form directing Citibank to remove

Ana as an owner of the checking account. Appellants do not dispute that Citibank had the authority under the parties' agreement to require signatures from all account holders before making title changes in an account. Instead, they suggest that a joint account owner's right to instruct Citibank to remove another owner from the joint account is a substantive right and takes priority over Citibank's contractual right to require signatures from all account owners before it will remove an account owner, which appellants suggest is merely a procedural right.

Appellants offer no authority supporting this contention. Instead, the legal authority they cite stands for the unremarkable proposition that under New York law, when the parties set out their agreement clearly and completely, it should be enforced according to its terms. *See Riverside South Planning Corp. v. CRP/Extell Riverside, L.P.*, 920 N.E.2d 359, 363 (N.Y. 2009); *Ins. Co. of New York v. Central Mut. Ins. Co.*, 850 N.Y.S.2d 56, 58 (N.Y. App. Div. 2008).[16] We conclude that under the plain language of the Citibank account agreements, Citibank had the

---

[16] The third case cited by appellants, *Christy v. Primo*, is an equitable proceeding in which the plaintiff sought specific performance of a real estate purchase agreement. 194 A.D.2d 910, 911 (N.Y. App. Div. 1993). The purchasers sent timely notice canceling the agreement by fax and regular mail. *Id.* The agreement required that notice of cancellation be sent by certified or registered mail. *Id.* It was undisputed that the plaintiff received the notice of cancellation. *Id.* The trial court awarded specific performance. *Id.* The appellate court began its analysis by observing that a court, in equitable proceedings, can look beyond technical formalities in contracts and ascertain whether the substance was met. *Id.* It went on to observe that it was undisputed that the only purpose of the specific notice requirement was to ensure that notice was promptly received and that it was undisputed the plaintiff had timely received the purchaser's cancellation notice. *Id.* It then reversed the trial court's judgment because the "plaintiffs' hands were not sufficiently 'clean' to be entitled to the equitable relief granted by [the trial court]." *Id.* at 11–12.

*Christy* is distinguishable because a declaratory judgment action is neither legal not equitable, but sui generis. *See Space Master Int'l, Inc. v. Porta-Kamp Mfg. Co.*, 794 S.W.2d 944, 947 (Tex. App.—Houston [1st Dist.] 1990, no writ). Moreover, *Christy* does not indicate that a contractual provision requiring consent before removing a joint account holder from an account is merely a technical formality. Rather, that requirement is grounded in New York's recognition that simply removing the holder's name will not divest her of her ownership interest. *See* Part IV.C., *supra*.

discretionary authority to require the signatures of all account owners before removing an owner from the account, which it exercised here. In any event, as explained in Part IV.C. above, Philippe Rene could not divest Ana of her ownership interest under New York law by removing her name from the accounts without her consent. Because appellants did not obtain and submit all account owners' signatures to Citibank, we conclude the trial court did not err when it refused to declare that Ana was no longer an owner of the Citibank accounts.

### C. The trial court did not err when it refused to order Citibank to pay the $2.5 million check written by Philippe Rene.

Next, appellants argue the trial court erred when it refused to order Citibank to pay the $2.5 million check Philippe Rene wrote to himself two days before his father's death. Because appellants dismissed their claims against Citibank with prejudice prior to trial, we conclude the trial court did not err when it refused to order Citibank to pay the $2.5 million check to Philippe Rene. To the extent appellants contend Ana had an unspecified contractual duty to honor the $2.5 million check, we disagree. Appellants do not explain how Ana had any duty— contractual or otherwise—to honor the $2.5 million check and ensure that it was paid. Accordingly, we hold the trial court did not err when it refused to order Ana to ensure Citibank honored the $2.5 million check. *See* Tex. R. App. P. 38.1(i) (requiring that appellant's brief contain clear and concise argument for the contentions made).

### D. Appellants have not shown that the trial court abused its discretion by not awarding them attorneys' fees.

In their final sub-issue, appellants contend the trial court abused its discretion when it did not award them any attorneys' fees in the final judgment. While appellants correctly point out that a party need not prevail to be awarded attorneys' fees pursuant to the Uniform Declaratory Judgments Act, they also

recognize that it is within the trial court's discretion to award "reasonable and necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2008); *see Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998); *Bank of N. Y. Mellon v. Soniavou Books, L.L.C.*, 403 S.W.3d 900, 907 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Under this statute, "the court may conclude that it is not equitable or just to award even reasonable and necessary fees." *Bocquet*, 972 S.W.2d at 21. Generally, a trial court abuses its discretion when it misinterprets or misapplies the law or acts arbitrarily or unreasonably. *Tanglewood Homes Ass'n v. Feldman*, 436 S.W.3d 48, 76 (Tex. App.—Houston [14th Dist.] 2014, pet. filed).

Although the jury found the amount of appellants' reasonable and necessary attorneys' fees for representation in the trial court, we see nothing inequitable or unjust in the trial court's decision not to award those fees to appellants.[17] There was no finding by the jury or the trial court in favor of appellants on any of the affirmative theories they asserted or declarations they sought, with one exception: the court did declare that two of the accounts were joint accounts with right of survivorship. But the court declined to declare Philippe Rene the sole owner of the accounts as he requested, and it awarded him less than half of the funds in each account after compensating Ana for her attorneys' fees. In addition, the jury found that Philippe Rene tortiously interfered with Ana's inheritance rights and awarded her damages. Considering the record as a whole, we conclude appellants have not demonstrated that the trial court abused its discretion when it awarded Ana, and not appellants, attorneys' fees. *See Tex. Health Care Ass'n v. Health & Human Servs. Comm'n*, 949 S.W.2d 544, 548 (Tex. App.—Austin 1997, no writ) (reviewing equity and justice of trial court's decision not to award fees under abuse

_____

[17] The trial court did award appellants their attorneys' fees for representation on appeal in the event they prevailed.

of discretion standard in light of the record).

**CONCLUSION**

Having overruled all issues raised by appellants, we affirm the trial court's judgment.


/s/    J. Brett Busby
Justice


Panel consists of Justices McCally, Busby, and Donovan.