# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PINE RIVER MASTER FUND LTD. :
AND PINE RIVER FIXED INCOME :
MASTER FUND LTD., :
 :
   Plaintiffs, :
 :
   v. : **C.A. No. 2017-0145-JRS**
 :
AMUR FINANCE COMPANY, INC. :
AND AMUR FINANCE IV LLC, :
 :
   Defendants. :

## MEMORANDUM OPINION

Date Submitted: July 10, 2017
Date Decided: September 13, 2017

C. Barr Flinn, Esquire, Emily V. Burton, Esquire, Lakshmi A. Muthu, Esquire and Meryem Y. Dede, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware and Michael M. Krauss, Esquire, Jane E. Maschka, Esquire and Michael F. Doty, Esquire of Faegre Baker Daniels LLP, Minneapolis, Minnesota, Attorneys for Plaintiffs.

Garrett B. Moritz, Esquire and Nicholas D. Mozal, Esquire of Ross Aronstam & Moritz LLP, Wilmington, Delaware and Christopher D. Kercher, Esquire, Andrew M. Berdon, Esquire, Julia M. Beskin, Esquire and Marlo A. Pecora, Esquire of Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

Plaintiffs, Pine River Master Fund Ltd. and Pine River Fixed Income Master Fund Ltd. (collectively, "Pine River"), have brought a litany of claims against Defendants, Amur Finance Company, Inc. ("AFC"), Amur Finance IV LLC ("Amur IV"), Amur Aviation LLC, PMC Aviation 2012-1 LLC, and Mostafiz ShahMohammed (collectively, "Amur"), arising from an allegedly failed lender/borrower relationship. In happier times, Pine River and Amur entered into a Secured Revolving Credit Agreement (the "Credit Agreement") whereby Pine River made loans to Amur that Amur, in turn, used to make investments in various operating companies. Needless to say, that relationship has since broken down, and Pine River has brought claims against Amur for various breaches of the Credit Agreement, fraud, indemnification, unjust enrichment and tortious interference with contract.

This decision addresses Pine River's motion for partial summary judgment with respect to one aspect of the parties' broader dispute: whether Amur has breached certain provisions of the Credit Agreement by using loaned funds to pay legal fees incurred by various Amur-related entities with regard to litigation in which Amur is involved, and whether such payments constitute an Event of Default under related provisions of the Credit Agreement. For the reasons explained below, I find that Amur has breached the Credit Agreement by making these indemnity payments, but the payments do not constitute an Event of Default.

1

# I. BACKGROUND[1]

The facts are drawn from the parties' pleadings and the evidence and affidavits gathered in appendices to the parties' briefs submitted in connection with their cross-motions for summary judgment.[2]

## A. Relevant Parties

Plaintiff, Pine River, is a global alternative investment firm that is headquartered in Minnetonka, Minnesota.[3] Pine River extended credit to Amur IV pursuant to the Credit Agreement, as described in more detail below.

Defendant, AFC, is a Delaware corporation with its principal place of business in White Plains, New York.[4] It is a diversified investment company that has investments and operations in several sectors, including aviation, general equipment, energy, shipping and logistics, and industrials.[5]

---

[1] All capitalized terms not expressly defined herein follow the definitions assigned in the Credit Agreement. Verified Supplemental and Am. Compl. ("Compl.") Ex. A ("Credit Agreement").

[2] *See* Ct. Ch. R. 56(c).

[3] Compl. ¶ 26.

[4] *Id.* at ¶ 27.

[5] Aff. of Mostafiz ShahMohammed in Supp. of Defs.' Opp'n to Pls.' Mot. for Summ. J. and in Supp. of Defs.' Cross-Mot. for Summ. J. ("ShahMohammed Aff.") ¶ 4.

Defendant, Amur IV, is a Delaware limited liability company with its principal place of business in White Plains, New York.[6] It is a special purpose vehicle that was created by AFC to make loans to, and investments in, businesses and assets in the transportation and commercial equipment financing and leasing industries.[7]

Defendant, Mostafiz ShahMohammed, is an individual residing in Putnam Valley, New York.[8] He is alleged to control the management of AFC and Amur IV and was personally involved in the negotiation of the Credit Agreement.[9]

## B. The Credit Agreement

The Credit Agreement, dated August 5, 2013, was executed by Amur IV as Borrower, AFC as Administrative Agent, Deutsche Bank Trust Company Americas as Collateral Agent and Pine River as Lender.[10] The loan balance currently stands at approximately $150 million,[11] with a maturity date in August, 2023.[12] As

---

[6] Compl. ¶ 30.

[7] ShahMohammed Aff. ¶ 8.

[8] Compl. ¶ 33.

[9] Compl. ¶ 37; ShahMohammed Aff. ¶ 5.

[10] Credit Agreement, at Preamble.

[11] Compl. ¶ 1.

[12] Credit Agreement, at § 1.01.

provided for in the Credit Agreement, Amur IV was to use the loaned funds to make investments in operating companies (the "Operating Companies").[13]

The Credit Agreement provides that the interest rate to be paid on the loans will be based on the weighted yield of Amur IV's investments in the Operating Companies.[14] The interest is divided between Cash Interest Accrual, which is "immediately payable in cash" on every Payment Date, and pay-in-kind interest (or

---

[13] ShahMohammed Aff. ¶ 15; Compl. ¶¶ 3–4. The "Operating Companies" at this point are Amur Equipment Finance, Inc. ("Amur EF," f/k/a Axis Capital, Inc.), Amur JMW Aviation LLC ("AJMWA"), Amur Aviation LLC, PMC Aviation 2012-1 LLC ("PMC") and Amur Helicopter Financial Services LLC ("Amur HFS"). ShahMohammed Aff. ¶ 15; Compl. ¶ 4. To invest in an Operating Company, Amur IV had to satisfy certain criteria, including unanimous approval of the board of directors of the Administrative Agent. *Id.* at § 2.03. At the time the investments were made, AFC was the Administrative Agent and Pine River had a seat on AFC's board of directors. *See* Compl. ¶ 8 ("A Pine River representative serves on the board of AFC, and the board's unanimous consent was required to approve the terms of Amur IV's loans and preferred investments in the Operating Companies . . . ."). According to Amur, this aspect of the Credit Agreement, as well as others that limited Pine River's direct control over investments that Amur IV made, was structured to prevent Pine River from being engaged in an "active trade or business" in the United States for federal income tax purposes. ShahMohammed Aff. ¶ 13.

[14] Credit Agreement, at § 2.08(a); ShahMohammed Aff. ¶ 12. As of March 2017, the interest was approximately 14.9% per annum. Aff. of Lakshmi A. Muthu Transmitting Exs. to the Br. in Supp. of Mot. for Summ. J. on Counts II and VI. ("Muthu Transmittal Aff.") Ex I.

4

"PIK Accrual"), which is added to the outstanding principal.[15]  Both are included in the Credit Agreement's definition of "Interest."[16]

As noted, Amur IV's sole purpose is to make investments in the Operating Companies using funds it receives from the credit facility and then to receive certain designated distributions from the Operating Companies.[17]  Pursuant to the Credit Agreement, Amur IV will then take the payments it receives from the Operating Companies and deposit them into the Collections Account.[18]  All funds in the Collections Account are then to be distributed by the Administrative Agent on the Payment Date in accordance with a waterfall of priority payments set out in Section 6.04 of the Credit Agreement (the "Waterfall").[19]

---

[15] Credit Agreement, at § 2.08(b), (d).  The Borrower will also be charged Additional Interest on any amounts due but not paid, which amounts are due along with the Cash Interest Accrual on each Payment Date.  *Id.* at § 2.08(d).

[16] *Id.* at § 1.01.

[17] *Id.* at § 2.03; ShahMohammed Aff. ¶ 17.

[18] Credit Agreement, at § 6.02.

[19] *Id.* at §§ 6.02, 6.04.  In full, the Waterfall provides that the Administrative Agent will distribute the Available Collections pursuant to the following priorities:

> First, to the Administrative Agent, the Administrative Fee and to the Collateral Agent, the Collateral Agent Fee, pro rata;
>
> Second, to the Collateral Agent and the Administrative Agent, to pay any unpaid costs, expenses and indemnities payable under the Operative Agreements (including without limitation those incurred in connection with enforcement of such Operative Agreements), pro rata;

> **Third**, Asset Operation Fees, if and when otherwise payable to the Persons due such payments, and *pro-rata* if less than all such amounts can be paid;
>
> **Fourth**, Participation Accrual and Excess Proceeds amounts, if and when otherwise payable, and pro rata if less than all such amounts can be paid;
>
> **Fifth**, to each Lender, accrued and unpaid Cash Interest Accrual on its respective Loan, including past-due and current Cash Interest Accrual, *pro-rata* if not all Cash Interest Accrual may be paid;
>
> **Sixth**, to each Lender, Additional Interest if any, due on its Loan, *pro-rata* if not all Additional Interest may be paid;
>
> **Seventh**, to the Reserve Account, to fund the Initial Reserve Amount or the Required Reserve Amount, as applicable;
>
> **Eighth**, to repay outstanding principal of Loans to the extent of PIK Accrual amounts then outstanding (including PIK accrual previously capitalized);
>
> **Ninth**, when, after giving effect to a payment made hereunder and in the absence of a Default or an Event of Default, the equity of the Borrower will be at least 17.5% of its capital, and the cash equity of the Borrower will be at least 10.0% of its capital, any dividends and distributions to the Parent which the Borrower may declare;
>
> **Tenth**, to Lenders to repay all remaining outstanding principal of the Loans, *pro-rata* if not all such principal may be repaid;
>
> **Eleventh**, so long as any Lender remains in its Availability Period, to the Reserve Account as a supplemental contribution thereto without regard to the usual upper limitation upon the amount of such Reserve Amount;
>
> **Twelfth**, to the Borrower (including disbursement to the Borrower of any amounts in the Reserve Account.

*Id.* "Operative Agreements" is defined to mean "this [Credit] Agreement, the Notes and each Security Document, and each other agreement, document or instrument entered into or delivered in connection therewith." *Id.* at § 1.01. "Notes" is defined as "the promissory notes executed by Borrower in favor of a Lender from time to time evidencing the Loan made by such Lender." *Id.* "Security Documents" is defined as "this [Credit] Agreement, the Security Agreement, UCC financing statements, any mortgage, and any other agreement, document or instrument entered into or delivered creating or expressing to create any security interest over all or any part of Borrower's assets in respect of the

Section 7.01(a) of the Credit Agreement provides that an Event of Default occurs when "the Borrower shall fail to pay any Interest on any Loan when and as the same shall become due and payable, and such failure shall continue unremedied for a period of sixty (60) days."[20] Section 7.01(b) provides that an Event of Default will also be declared when "the Borrower shall fail to pay any Interest on any Loan when and as the same shall become due and payable (without giving effect to any grace period provided under Section 7.01(a)) on two or more Payment Dates."[21]

## C. The Administrative Agent

The parties to the Credit Agreement appointed AFC to serve as the initial Administrative Agent for the Lender.[22] The Administrative Agent is charged with the power to "take such action on [Pine River's] behalf under the Operative Agreements and to exercise such powers and perform such duties as expressly are delegated to them [sic] by the Operative Agreements, together with such powers as are reasonably incidental thereto."[23] The Credit Agreement provides that the

---

obligations of the Borrower under this Agreement or any of the Operative Agreements." *Id.*

[20] Credit Agreement, at § 7.01(a).

[21] *Id.* at § 7.01(b).

[22] *Id.* at Preamble. The Credit Agreement provides, however, that the Administrative Agent will not be "deemed to have any fiduciary relationship with [Pine River] . . . ." *Id.* at § 8.01.

[23] *Id.* at § 8.01.

Administrative Agent shall not "have duties or responsibilities, except those expressly set forth herein or in any other Operative Agreement."[24]

As among its designated roles, the Administrative Agent is responsible for calculating the distributions under the Waterfall set out in Section 6.04 and then directing those distributions through its issuance of an Administrator Report.[25] The Administrator Report is due on the Determination Date, which the Credit Agreement defines as the third business day prior to the Payment Date.[26] The Administrative Agent is then required to distribute the amounts paid into the Collections Account in accordance with the Waterfall set forth in Section 6.04.[27]

The Credit Agreement provides for indemnification of the Administrative Agent for certain expenses incurred in connection with its role as Administrative Agent under the Credit Agreement and the Operative Agreements.[28] Specifically, Section 9.03(b) of the Credit Agreement provides that:

---

[24] *Id.*

[25] *Id.* at §§ 6.03, 6.04.

[26] *Id.* at §§ 6.03, 1.01. The Payment Date is the 15th calendar day of the month, unless that day is not a business day, in which event the Payment Date will be the next succeeding business day. *Id.* at § 1.01.

[27] *Id.* at § 6.04. The Administrative Agent also has additional duties upon the occurrence of an Event of Default, s*ee id.* at §§ 7.02(a), 7.03, 8.05, 2.11, and a variety of ministerial duties on behalf of the lenders, *see id.* at §§ 7.09(g), 2.03, 2.06(a), 2.06(c), 2.09(b), 2.09(d), 2.10(b), 2.11(d), 2.12(a), 3.01(q), 4.01(h), 4.03, 5.01, 5.04, 6.01(c), 9.0.

[28] *Id.* at § 9.03(b).

The Borrower shall pay all reasonable (A) expenses incurred by the Administrative Agent and the Collateral Agent, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent and the Collateral Agent, in connection with the administration of this Agreement and each other Operative Agreement or any amendments, modifications or waivers of the provisions hereof or thereof, and (B) reasonable fees and expenses incurred by the Administrative Agent, the Collateral Agent and the Lenders, including the fees, charges and disbursements of any counsel for the Administrative Agent, the Collateral Agent or the Lenders, in connection with the enforcement or protection of its rights in connection with this Agreement or any other Operative Agreement, including its rights under this Section, or in connection with the Loans made, including all such expenses incurred during any workout, restructuring or negotiations in respect of such Loans.[29]

This right to indemnification "continue[s] to inure to [the former administrative agent's] benefit as to any actions taken or omitted or to be taken by the [former administrative agent] hereunder."[30]  Payments under this provision are to be made under the Second priority of the Waterfall.[31]

### D. The Operating Company Lawsuits

In late 2015 and early 2016, Amur caused various Operating Companies and other Amur-affiliated entities to either commence or defend litigation in Virginia, New York and Delaware (the "Operating Company Lawsuits").[32]  AFC is a named

---

[29] *Id.*

[30] *Id.* at § 8.06.

[31] *Id.* at § 6.04.

[32] *See* Muthu Transmittal Aff. Ex. P (Verified Pet. For Judicial Dissolution of Amur JMW Aviation LLC for the Purpose of Conducting a Private Auction Pursuant to 6 *Del. C.* § 18-

9

party in only one action in New York and, in that action, AFC is named only in its capacity as a party to a servicing agreement to one of the Operating Companies.[33] In the remainder of the lawsuits, Amur IV and PMC, of which Amur IV is a managing member, are the named parties in the suit.[34] According to Amur, AFC caused these lawsuits to be brought or defended in its capacity as Administrative Agent under the Credit Agreement in order to "protect Pine River's investment as a Lender, because any recoveries from the Operating Company Lawsuits will flow into the Collections Account for distribution, through the Credit Agreement's Waterfall and on to Pine River (after payment of expenses)."[35] Pine River disagrees and maintains that the lawsuits are not authorized by, nor subject to indemnification under, any provision of the Credit Agreement.

---

802, *In re Amur JMW Aviation LLC*, C.A. No. 12281-VCS (Del. Ch. April 29, 2016)), Muthu Transmittal Aff. Ex. Q (Compl., *Alpha Zulu AV LLC v. Amur JMW Aviation LLC*, No. 65118/2016 (N.Y. Sup. Ct. July 27, 2016)), Muthu Transmittal Aff. Ex. R (First Am. Compl., *PMC Aviation 2012-1 LLC v. Dynamic Int'l Airways, LLC*, C.A. No. CL15-2512 (Va. Cir. Ct. May 9, 2016)); Aff. of Emily V. Burton Transmitting Exs. To the Reply Br. in Supp. of Mot. for Summ. J. on Counts II and VI and Answering Br. in Opp'n to Cross-Mot. for Summ. J. ("Burton Transmittal Aff.") Ex. E (First Am. Verified Compl., *PMC Aviation 2012-1 LLC, et. al., v. Jet Midwest Gp. LLC, et. al.*, No. 65404/2015 (N.Y. Sup. Ct. Feb. 3, 2016)).

[33] Muthu Transmittal Aff. Ex. Q (Compl., *Alpha Zulu AV LLC v. Amur JMW Aviation LLC*, No. 65118/2016 (N.Y. Sup. Ct. July 27, 2016)).

[34] *Id.*; Makam Aff. ¶¶ 10–14.

[35] Defs.' Opp'n Br. 22 (citing Makam Aff. ¶¶ 13, 25; ShahMohammed Aff. ¶ 17).

The legal bills in these four cases have, to date, totaled approximately $7 million.[36]  Between November 2016 and February 2017, Amur-affiliated entities received $3,118,009.97 from the Collections Account under the Second priority of the Waterfall for purported indemnities of the Administrative Agent under Section 9.03 of the Credit Agreement.[37]  The undisputed record evidence reveals that the expenses were incurred to pay the legal fees of counsel for Amur IV and other Amur affiliates, but not AFC itself.[38]  These indemnity payments decreased the amount of PIK Accrual paid under the Eighth priority of the Waterfall, thereby increasing the outstanding principal under the Credit Agreement.[39]

### E. Pine River Removes AFC as Administrative Agent under the Credit Agreement

Pine River has the power under the Credit Agreement to remove and replace the Administrative Agent in its sole discretion.[40]  It exercised this power on November 22, 2016, and replaced AFC as Administrative Agent with Lighthouse

---

[36] Makam Aff. ¶ 13.

[37] *See* Muthu Transmittal Aff. Ex. B–E, F, G, H.

[38] *Id.*

[39] *See* Muthu Transmittal Aff. Ex. B–E (Administrator Reports for November 2016 through February 2016 prepared by AFC showing the increase in PIK Accrual added to principal).

[40] Credit Agreement, at § 8.06.

Management Group, Inc.[41]  The effective date of the replacement was agreed to be January 20, 2017, meaning that Lighthouse was to act as Administrative Agent for the February 2017 Payment Date.[42]  After assuming the role as Administrative Agent, it is alleged that Lighthouse failed to provide an Administrator Report when due for the February 2017 Payment Date.[43]  When no report was forthcoming, AFC feared that the Borrower would be unable to make the required payments under the Waterfall since the calculation of these payments was to have occurred in the Administrator Report.  Accordingly, it took on that responsibility (including the calculation of the Waterfall payments) to prevent Pine River from declaring an Event of Default.[44]  Amur IV made its February 2017 payments from the Collections Account in accordance with the calculations set forth in AFC's February Administrator Report.[45]

### F. Procedural Posture

On February 23, 2017, Plaintiffs, Pine River Master Fund Ltd. and Pine River Fixed Income Master Fund Ltd., filed their Verified Complaint (the "Original

---

[41] Compl. ¶ 19; Makam Aff. ¶ 21.

[42] Muthu Aff. Ex. A; Compl. ¶ 143; Makam Aff. ¶¶ 30–31.

[43] Makam Aff. ¶ 32.

[44] *Id.* at ¶¶ 33–34.

[45] Makam Aff. ¶ 34.

12

Complaint") seeking a declaratory judgment as to various alleged breaches of the Credit Agreement by Amur, injunctive relief to prevent future breaches and money damages. The parties later resolved Pine River's request for a temporary restraining order by various stipulations, the most recent of which was entered on March 30, 2017.[46] Amur filed a motion to dismiss the Original Complaint on March 16, 2017. Pine River then sought a preliminary injunction, which was set to be heard on June 13, 2017.[47]

On March 31, 2017, Pine River filed the present motion for partial summary judgment on Counts II and VI of its Original Complaint for breach of contract due to AFC's payment of counsel fees in the Operating Company Lawsuits under the Second priority of the Waterfall and for a declaration that an Event of Default had occurred due to the failure to pay interest that was "due and payable" under Section 7.01(a) and (b) of the Credit Agreement. On April 25, 2017, the Court entered a Stipulation and Order Resolving Pine River's Anticipated Motion for a Preliminary Injunction. Amur filed a cross-motion for partial summary judgment as to Counts II and VI of the Original Complaint on May 1, 2017. The Court heard Oral Argument on the cross-motions on July 10, 2017.

---

[46] Second Am. Stip. and Order Resolving Pine River's Mot. for a TRO (the "Second Amended TRO Order") (DI 40). The initial order was entered on March 3, 2017, DI 27, and amended for the first time on March 13, 2017, DI 32.

[47] *See* Stip. and Order Regarding Disc. and Briefing Schedule (DI 51).

13

On August 22, 2017, Pine River filed Plaintiffs' Verified Supplemental and Amended Complaint (the "Amended Complaint"). At the Court's request, the parties advised the Court by letter dated August 30, 2017, that the Amended Complaint did not affect the submitted cross-motions for summary judgment, except that the claim for Event of Default under Section 7.01(a) and (b) of the Credit Agreement under Count VI of the Original Complaint is now set forth in Count II of the Amended Complaint along with the breach of contract claims relating to the payment of indemnification for counsel fees incurred by Amur-affiliated entities.[48]

## II. ANALYSIS

For the reasons that follow, I find that Amur breached Section 6.04 of the Credit Agreement through the payment of indemnities for the Operating Company Lawsuits, but this breach did not constitute an Event of Default under Section 7.01(a) and (b). I explain these findings below after first addressing the standard of review.

### A. Standard of Review on Summary Judgment

Pursuant to Court of Chancery Rule 56(c), summary judgment will be granted where "there are no questions of material fact and the moving party is entitled to

---

[48] I note that the Amended Complaint, at Count III, alleges that Amur IV breached Section 5.07(d) and (f) of the Credit Agreement by paying the legal fees at issue in this motion, and that this breach constitutes an Event of Default under Section 7.01(f). Summary judgment with respect to that claim has not been briefed and is not addressed here.

judgment as a matter of law."[49]  When considering a motion for summary judgment, "the burden is on the movant, and the Court reviews all of the evidence in the light most favorable to the non-moving party."[50]  When a party seeks summary judgment based on its proffered construction of a contract, the court must remain mindful that:

> A contract may be enforced summarily where its terms are unambiguous.  Whether a contract is ambiguous is a question of law[,] and extrinsic evidence may not be considered unless the document itself is ambiguous.  Furthermore, extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face.[51]

---

[49] *Senior Tour Players 207 Mgmt. Co. LLC v. Golftown 207 Hldg. Co., LLC.*, 853 A.2d 124, 126 (Del. Ch. 2004).

[50] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

[51] *Vitullo v. New York Cent. Mut. Fire Ins. Co.*, 51 N.Y.S.3d 768, 770 (N.Y. App. Div. 2017) (internal quotation marks and citations omitted).  *See also United Rentals*, 937 A.3d at 830 ([S]ummary judgment is appropriate only if the contract in question is unambiguous. Therefore, the threshold inquiry when presented with a contract dispute on a motion for summary judgment is whether the contract is ambiguous.  Ambiguity does not exist simply because the parties disagree about what the contract means.  Moreover, extrinsic, parol evidence cannot be used to manufacture an ambiguity in a contract that facially has only one reasonable meaning.  Rather, contracts are ambiguous 'when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.' (citations omitted)). As one might gather, the Credit Agreement is governed by New York law.  Credit Agreement, § 9.09(a).  Even so, Delaware law is instructive here.  There is no need to choose, however, since there is no conflict of laws here.  *See Viking Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76, 90 (Del. Ch. 2009) ("Fortunately, [Delaware and New York] apply the same general principles of contract interpretation.").

If the language in a contract is ambiguous, however, the court will not resolve the ambiguity on summary judgment.[52] When cross-motions for summary judgment are filed and neither party has presented an argument leaving material facts in dispute, Court of Chancery Rule 56(h) provides that "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[53] If, however, a material factual dispute does exist, the Court must deny summary judgment.[54]

## B. Amur has Breached Section 6.04 of the Credit Agreement through the Indemnification of Legal Fees for the Operating Company Lawsuits

Amur contends that, as Administrative Agent, AFC was entitled to indemnification under the Second priority of the Waterfall set forth in Section 6.04 for the payment of the legal expenses incurred through the enforcement or protection of the rights of Amur IV (the Borrower) in connection with the Operative Agreements. Specifically, Amur invokes Section 9.03(b)(B), which provides:

> The Borrower shall pay all . . . (B) reasonable fees and expenses incurred by the Administrative Agent, the Collateral Agent and the Lenders, including the fees, charges and disbursements of any counsel for the Administrative Agent, the Collateral Agent, or the Lenders, in connection with the enforcement or protection of *its* rights in connection with this Agreement or any other Operative Agreement, including *its* rights under this Section, or in connection with the Loans

---

[52] *Shadlich v. Rongrant Assocs., LLC*, 887 N.Y.S.2d 228, 229 (N.Y. App. Div. 2009).

[53] Ch. Ct. R. 56(h).

[54] *Comet Sys., Inc. S'holder Agent v. MIVA, Inc.*, 980 A.2d 1024, 1029 (Del. Ch. 2008).

made, including all such expenses incurred during any workout, restructuring or negotiations in respect of such Loans.[55]

Amur's reliance upon this provision of the Credit Agreement to justify the payment of legal fees begs the fundamental question: who does "its" refer to – i.e. whose rights may the Administrative Agent seek to enforce or protect subject to the Borrower's obligation to pay fees and expenses? Pine River contends that "its" refers to the Administrative Agent, the Collateral Agent or the Lenders; Amur contends that "its" refers to the Borrower. Pine River cites to *Garner's Modern American Usage* for the proposition that "its" should refer to the nearest referent— in this case, "the Administrative Agent, the Collateral Agent and the Lenders."[56] Amur counters that *Garner's* actually supports its construction of Section 9.03(b)(B) because "a relative pronoun [in this case "its"] is supposed to agree with its antecedent in both number and person."[57]

---

[55] Credit Agreement, at § 9.03(b)(B) (emphasis supplied).

[56] Reply Br. in Supp. of Mot. for Summ. J. on Counts II and VI and Answering Br. in Opp'n to Cross-Mot. for Summ. J. ("Pls.' Reply Br.") 15–16 (citing Bryan A. Garner, *Garner's Modern American Usage*, at 540 (3d ed. 2009) ("When a word such as a pronoun points back to an antecedent or some other referent, the true referent should generally be the closest appropriate word[.]")).

[57] Defs.' Reply Br. in Supp. of Defs. Cross-Mot. for Summ. J. ("Defs.' Reply Br.") 11 (quoting Bryan A. Garner, *Garner's American Usage*, at 196 (4th ed. 2016). *See also id.* ("Proximity isn't the only signal of what referent a word is pointing to, though. Number and gender are often clear signals." (quoting *Garner's American Usage*, at 598 (4th ed. 2016)).

While, in isolation, these competing views of the proper construction of "its" may portend ambiguity, any notion of ambiguity falls away when Section 9.03(b)(B) is considered in the context of the entire agreement. It is, of course, a central tenant of contract construction that a contract must be read as a whole, and "all portions of a contract should be read together to determine its meaning."[58] Indeed, "[t]he entire contract must be reviewed and '[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.'"[59]

As Pine River points out, in the preamble of the Credit Agreement, the Administrative Agent is said to act as agent *for the Lenders*.[60] While Amur noted at oral argument that the Credit Agreement disclaims any "fiduciary relationship" between the Administrative Agent and the Lender,[61] this does not negate that the Credit Agreement still provides for an agency relationship between the

---

[58] *Banos v. Rhea*, 25 N.Y.3d 266, 278 (N.Y. 2015). *See also Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014).

[59] *Riverside South Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (N.Y. 2009).

[60] Tr. of Oral Arg. Cross-Mot. for Summ. J. ("Tr.") 24:13–15. *See.* Pls.' Opening Br. 14–16 (describing the role of the Administrative Agent under the Credit Agreement). *See also* Credit Agreement, at § 8.01 (describing duties owed by Administrative Agent to the Lender).

[61] Tr. 70:19–71:10 (citing Credit Agreement, at § 8.01).

18

Administrative Agent and the Lender; nowhere in the Credit Agreement does it say anything about the Administrative Agent acting as agent for or on behalf of the Borrower. Amur's interpretation, which would have the Administrative Agent enforcing the rights of the Borrower, implies an agency relationship that is not provided for or even suggested within the four corners of the Credit Agreement.

Additionally, Amur's construction of the Credit Agreement would require the Borrower to indemnify the Administrative Agent for the fees and expenses incurred when enforcing the Borrower's rights under the Credit Agreement, including enforcement of the Borrower's rights against the Administrative Agent's principal, the Lender. As Pine River points out, "[t]he Lenders would never incur expenses to enforce the Borrower's rights against themselves."[62] And any construction that would sanction this result would be "absurd."[63]

Amur attempts to downplay this absurdity by arguing that the indemnification rights extend to all Operative Agreements, and there may be Operative Agreements where the Lender and Borrower are not adverse.[64] While that may be so, this does not alter the fact that Amur's proffered construction also contemplates a scenario

---

[62] Pls.' Reply Br. 16.

[63] *See Greenwich Capital Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 415 (N.Y. App. Div. 2010) ("[A] contract should not be interpreted to produce a result that is absurd . . . ." (internal quotation marks omitted)).

[64] *See* Defs.' Reply Br. 8.

where Pine River's agent (the Administrative Agent) would be enforcing the Borrower's rights against Pine River. This construction cannot stand. When read as a whole, giving effect to the clear and exclusive agency created between the Administrative Agent and the Lender, it is clear that Section 9.03(b)(B) does not allow the Administrative Agent to pay out legal fees and expenses incurred in protecting or enforcing the rights of the Borrower.

Amur next contends that Pine River's construction of Section 9.03(b)(B) renders Section 9.03(c) of the Credit Agreement superfluous[65] because, under this construction, both provisions would provide for the indemnification of the Administrative Agent's expenses incurred in asserting or defending the indemnified parties' rights under the Operative Agreements. Section 9.03(c), however, provides that the Borrower will indemnify Indemnitees (which includes, *inter alia*, the Administrative Agent) against

> any and all liabilities, obligations, losses, damages, penalties, claims actions, suits, settlements, demands judgments, Taxes, . . . out-of-pocket costs, expenses and disbursements (including, without limitation, reasonable legal fees and expenses (including with respect to enforcement of this indemnity or any other provision of the Operative Agreements) . . . ) . . . arising out of or resulting from or attributable to (A) any of the Operative Agreements . . . .[66]

---

[65] *See LNR P'rs LLC v. C-III Asset Mgmt. LLC*, 2014 WL 1312033, at *21 (Del. Ch. Mar. 31, 2014) (applying New York law and stating that contracts will be construed to avoid rendering a clause superfluous).

[66] Credit Agreement, at § 9.03(c)(i)(A).

Reading Section 9.03(c) together with Section 9.03(b)(B), it is clear that Section 9.03(c) addresses defensive actions (third-party claims brought against the Administrative Agent) while Section 9.03(b) addresses offensive actions (those the Administrative Agent brings against others to enforce its rights or those of the Lender).

Implicit in Amur's argument is its acknowledgment that the Operating Company Lawsuits were brought to enforce the Borrower's rights.[67] Therefore, because the Operating Company Lawsuits seek to vindicate the Borrower's rights and not the Administrative Agent's rights, the improper payment of indemnities through the Second priority of Section 6.04 in November 2016, December 2016,

---

[67] *See, e.g.*, Defs.' Reply Br. in Supp. of Defs.' Cross-Mot. for Summ. J. 7 ("Amur's interpretation of 9.03(b)(B) as indemnifying AFC as Administrative Agent for fees incurred in enforcing or protecting the rights of the Borrower is not a 'misconstruction.'"), 16 ("[S]ection 9.03(b)(B) authorizes the satisfaction of the Administrative Agent's indemnities for legal expenses incurred in connection with the enforcement or protection of the Borrower's rights under the Operative Agreements, and the direction of the Operating Company Lawsuits is 'incidental' to the enforcement and protection of these rights."). Amur also contends that the Operating Company Lawsuits "protect Pine River's investment as Lender, because any recoveries from the Operating Company Lawsuits will flow into the Collections Account for distribution, through the Credit Agreement's Waterfall and on to Pine River (after payment of expenses.)" Defs.' Opp'n Br. 22. While this may be true, the indemnification provision in Section 9.03(b)(B) does not provide for indemnification rights so expansive as to cover any expenses incurred by the Borrower for claims that may ultimately benefit Pine River.

January 2017 and February 2017 were not authorized by, and constituted a breach of, Section 6.04 of the Credit Agreement.[68]

### C. There Has Been no Event of Default under Section 7.01(a) or (b) because the PIK Accrual was not "Due and Payable"

Having found that Amur breached Section 6.04, I turn now to the question of whether this breach caused an Event of Default under Sections 7.01(a) or 7.01(b) of the Credit Agreement. According to Pine River, an Event of Default occurred because the money paid out as "indemnification" to Amur under the Second priority of the Waterfall should have been paid out to Pine River under the Eighth priority as PIK Accrual.[69] Pine River maintains that these misdirected payments, which were made on November 15, December 15, January 17 and February 15, constituted an Event of Default under both Section 7.01(a), which states that an Event of Default occurs when there is a failure to pay Interest that is not cured within 60 days, and

---

[68] Having found this breach of Section 6.04, I need not address Pine River's arguments that Section 6.04 was also breached because: (1) the Second priority only allows distributions to be made to AFC as Administrative Agent, and not distributions for other Amur entities, (2) indemnification is only available to enforce the "Operative Agreements," which are not at issue in the Operating Company Lawsuits, and (3) the February distribution was not directed by the Administrative Agent, which at the time was Lighthouse. Additionally, because the Court has reached its determination of breach based on the unambiguous language of the Credit Agreement, there is no need to address Amur's argument that the motion should be denied pursuant to Court of Chancery Rule 56(f) so that it may conduct discovery of extrinsic evidence.

[69] PIK Accrual is included in the definition of Interest in the Credit Agreement. Credit Agreement, at § 1.01.

22

under Section 7.01(b), which states that an Event of Default occurs where there is a failure to pay Interest on two consecutive Payment Dates.[70] Amur counters that even if it did breach Section 6.04 through its payment of indemnities, these payments did not constitute an Event of Default because the PIK Accrual was not Interest that was "due and payable," as is required for an Event of Default to occur under Sections 7.01(a) and (b).

Amur is correct that Events of Default under Section 7.01(a) and (b) occur only when Interest is "due and payable." While not defined in the Credit Agreement, Black's Law Dictionary defines "due and payable" as "owed and subject to immediate collection because a specified date has arrived or time has elapsed, or some other condition for collectability has been met."[71] With this definition in mind, I disagree with Pine River that the breach of Section 6.04 constitutes an Event of Default because, while the money paid as indemnities should have flowed through the Waterfall and been paid as PIK Accrual under the Eighth priority, this was not a failure to pay Interest that was "due and payable" under the Credit Agreement. The

---

[70] According to Pine River, an Event of Default occurred under Section 7.01(b) on December 15, 2016, because this was the second consecutive date on which PIK Accrual was not paid, and under Section 7.01(a) on January 14, 2017, because 60 days elapsed after the first date upon which PIK Accrual was not paid.

[71] Black's Law Dictionary (10th ed. 2014). New York courts, like Delaware courts, will refer to dictionaries to assist in the construction of undefined terms within a contract without offense to the parol evidence rule. *Mazzola v. Cty. of Suffolk*, 533 N.Y.S.2d 297, 297 (N.Y. App. Div. 1988).

Credit Agreement provides that any PIK Accrual not paid in any given month is added to the principal, and therefore due upon the maturity of the loans.[72] In contrast, the Credit Agreement specifically provides that the Cash Interest Accrual is due immediately as a monthly installment on the Payment Date.[73]

When the Borrower fails to pay PIK Accrual, the amounts owed are capitalized into principal and cease to become "Interest." Thus, the non-payment of PIK Accrual cannot constitute an Event of Default under Sections 7.01(a) and (b). Indeed, the Eighth priority of Section 6.04—the very provision upon which Pine River relies to declare an Event of Default due to the non-payment of PIK Accrual— characterizes PIK Accrual as principal when it provides that outstanding collections will at that point be used "to repay outstanding *principal* of Loans to the extent of PIK Accrual amounts then outstanding."[74] Therefore, because the PIK Accrual was converted to principal as a result of the non-payment, even though it would have been paid under the Eighth priority of the Waterfall but for Amur's breaches of

---

[72] Credit Agreement, at § 2.08(d).

[73] *Id.* Any Additional Interest also must be paid monthly on the Payment Date. *Id.*

[74] *Id.* at § 6.04 (emphasis added). The Tenth priority then provides that funds in the Collections Account will go to any remaining principal, meaning principal above the month's PIK Accrual. *Id.*

Section 6.04, these amounts were not "due and payable" as required for an Event of Default to be declared under Section 7.01(a) and (b).[75]

## III. CONCLUSION

For the foregoing reasons Pine River's motion for summary judgment is GRANTED in part and DENIED in part as to Count II of the Amended Complaint. Amur's cross motion for summary judgment as to Count II is likewise GRANTED in part and DENIED in part. Amur shall be enjoined from "distributing further amounts from the Collections Account and Amur IV [shall be enjoined from] reducing the amounts that the Operating Companies are required to distribute to the Collections Account or otherwise interfering in distributions to Pine River."[76] The parties shall confer and submit an implementing order within 10 days.

---

[75] Having found that an Event of Default has not occurred because the PIK Accrual was not "due and payable," I need not reach Amur's arguments that an Event of Default additionally did not occur because Amur IV was simply complying with payment directives in the Administrator Report or that it would be "commercially unreasonable" to declare an Event of Default due to its failure to pay a portion of PIK Accrual.

[76] Pls.' Opening Br. 29. Amur did not address this request for injunctive relief in its initial opposition to Pine River's motion for summary judgment, and issues not briefed are deemed waived. *See Emerald P'rs v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2008), *aff'd*, 840 A.2d 641 (Del. 2003). Amur later argued that it "squarely" addressed the point because "Pine River's request for injunctive relief depends on showing that Amur breached section 6.04, a (mistaken) contention that Amur has rebutted multiple times." Defs.' Reply Br. 28 (citations omitted). While Amur may have addressed whether there was a breach of Section 6.04, it did not address the requested injunctive relief in its initial brief and, therefore, its untimely argument in opposition to such relief is waived. Regardless of waiver, injunctive relief is appropriate here given the recurring nature of the breach. *See Cheese Shop Int'l Inc. v. Steele*, 311 A.2d 870, 871 (Del. 1973) ("The nature of the contract creates an imminent threat of a multiplicity of actions. It is conceivable

that, absent an equitable remedy, the plaintiff will be obliged to institute separate proceedings at law for each month the defendant fails to account for profits. Where, as here, the remedy at law is clearly inadequate because of the necessity of a multiplicity of actions, equitable relief will be granted.").